No. 2016-1616

# United States Court of Appeals for the Federal Circuit

————————————

TRADING TECHNOLOGIES INTERNATIONAL, INC.,

*Plaintiff-Appellee*,

v.

CQG, INC., CQG, LLC, fka CQGT, LLC,

*Defendants-Appellants*.

————————————

Appeal from the United States District Court for the Northern District of Illinois in No. 1:05-cv-04811, Judge Sharon Johnson Coleman

## OPENING BRIEF OF APPELLANTS

Adam G. Kelly
William J. Voller III
John A. Cotiguala
LOEB & LOEB LLP
321 North Clark Street
Suite 2300
Chicago, IL 60654
(312) 464-3100

Kenneth R. Adamo
Eugene Goryunov
Meredith Zinanni
Vishesh Narayen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000

April 25, 2016

*Counsel for Defendants-Appellants*

# CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

**1.     The full name of every party represented by me is:**

CQG, Inc. and CQG, LLC (f/k/a CQGT, LLC)

**2.     The name of the real party in interest is:**

CQG, Inc. and CQG, LLC (f/k/a CQGT, LLC) are the real parties in interest.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

CQG, Inc. does not have a parent company.  CQG, LLC is a wholly-owned subsidiary of CQG, Inc.  No publicly held company owns 10 percent or more of the stock of either CQG, Inc. or CQG, LLC.

**4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:**

**<u>Kirkland & Ellis LLP</u>**

Kenneth R. Adamo

John O'Quinn

Eugene Goryunov

Meredith Zinanni

Vishesh Narayen

**<u>Loeb & Loeb LLP</u>**

Adam Glenn Kelly

Christopher M Swickhamer

John Anthony Cotiguala

Laura A Wytsma

Terry D Garnett

William J. Kramer

William Joshua Voller

Melaina D. Jobs

Johnnet Simone Jones

**Chuhak & Tecson, P.C.**

David Seth Argentar

**Bell, Boyd & Lloyd, LLC (now K&L Gates)**

Heather Ann Boice

Jeana R. Lervick

Kara Eve Foster Cenar

**Faegre & Benson LLP (now Faegre Baker Daniels, LLP)**

Jared B. Briant

Nina Y. Wang

Mark W. Fischer

Neal S. Cohen

**Welsh & Katz, Ltd.**

Joseph E. Cwik

Kara Eve Foster Cenar

Robert B. Breisblatt

**Bryan Cave LLP**

Kara Eve Foster Cenar

Mariangela M. Seale

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................. viii

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

STATEMENT OF THE ISSUES...........................................................................3

STATEMENT OF THE CASE...............................................................................4

STATEMENT OF FACTS .....................................................................................5

I.    Commodities Trading ..................................................................................5

II.   The Patents-In-Suit .....................................................................................6

III.  The District Court's Ruling .......................................................................14

SUMMARY OF THE ARGUMENT ...................................................................15

STANDARD OF REVIEW .................................................................................17

ARGUMENT .......................................................................................................18

I.    THE DISTRICT COURT ERRED IN FINDING THE
      CHALLENGED CLAIMS PATENT-ELIGIBLE UNDER § 101. ..............18

      A.    *Alice* Step One: The Claims Are Directed To An Abstract
            Commodity-Trading Idea..................................................................20

            1.    The Challenged Claims Are Directed To Commodities
                  Trading, A Fundamental Economic Practice And
                  Abstract Idea. .........................................................................21

            2.    The "Vintage" Of An Abstract Idea Or Fundamental
                  Economic Practice Is Irrelevant. ............................................23

            3.    The Details Of The Challenged Claims Are Similarly
                  Abstract. ..................................................................................26

            4.    Claims Directed To An Abstract Idea Remain Abstract
                  Even If They Purportedly Solve A Problem In The Art. ..........29

5.      Claims Directed to an Abstract Idea Remain Abstract
        Even Without Total Preemption. ...............................................31

B.      *Alice* Step Two: The Claim Elements, Individually And As An
        Ordered Combination, Add Nothing Inventive...................................33

        1.      The "Static Price Index" Does Not Transform The
                Abstract Commodity-Trading Idea Into A Patent-Eligible
                Invention. ....................................................................33

        2.      The Other Claim Elements, Individually, Do Not
                Transform The Abstract Commodity-Trading Idea Into A
                Patent-Eligible Invention. ...........................................42

        3.      The Claim Elements, Viewed As An Ordered
                Combination, Do Not Transform The Abstract
                Commodity-Trading Idea Into A Patent-Eligible
                Invention. ..................................................................44

        4.      *DDR Holdings*, On Which The District Court Heavily
                Relied, Does Not Save The Claims. .........................46

C.      The Challenged Claims Also Fail The Machine-or-
        Transformation Test, Confirming They Are Not Patent-Eligible.......51

II.     THE DISTRICT COURT ERRED IN IMPOSING A CLEAR AND
        CONVINCING BURDEN OF PROOF ON CQG'S § 101
        CHALLENGE. ...........................................................................54

CONCLUSION ....................................................................................57

# TABLE OF AUTHORITIES

<div align="right"><b>Page(s)</b></div>

## CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)............................................................ 19, 41, 54

*Advanced Auctions LLC v. eBay, Inc.*,
  No. 13CV1612, 2015 WL 1415265 (S.D. Cal. Mar. 27, 2015).................... 30, 31

*Affinity Labs of Texas, LLC v. Amazon.com, Inc.*,
  No. 6:15-CV-0029, 2015 WL 3757497(W.D. Tex. June 12, 2015) ....................56

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ............................................................... passim

*Anhydrides & Chemicals, Inc. v. U.S.*,
  130 F.3d 1481 (Fed. Cir. 1997)..........................................................55

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015)..........................................................32

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012)..........................................................46

*Bilski v. Kappos*,
  561 U.S. 592 (2010) ................................................................. passim

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)........................................................ 23, 25, 50

*Cloud Satchel, LLC v. Amazon.com, Inc.*,
  76 F. Supp. 3d 553 (D. Del. 2014)......................................................25

*Content Extraction & Transmission LLC v. Well Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014)........................................................ 24, 28, 48, 56

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
  558 F. App'x 988 (Fed. Cir. 2014) ..................................................... 18, 23

*CyberSource, Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)..................................................... passim

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)................................................................. passim

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012)................................................................. passim

*Diamond v. Diehr*,
  450 U.S. 175 (1981) ...................................................................... 30, 39

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014)........................................... 26, 37, 41, 45

*Enfish, LLC v. Microsoft Corp.*,
  56 F. Supp. 3d 1167 (C.D. Cal. 2014) ........................................ 38, 42

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
  No. 13-03587, 2015 WL 5829783 (N.D. Cal. Oct. 6, 2015) ..............................31

*Garfum.com Corp. v. Reflections By Ruth d/b/a Bytephoto.com*,
  No. 14-5919, 2016 WL 1242762 (D.N.J. Mar. 30, 2016) ...................................48

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) ............................................................................18

*Hewlett Packard Co. v. ServiceNow, Inc.*,
  No. 14-CV-00570, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015) ....................38

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ........................... 52, 53

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015)................................................................. passim

*Intellectual Ventures I LLC v. Symantec Corp.*,
  100 F. Supp. 3d 371 (D. Del. 2015) ...................................................49

*Internet Patents Corp. v. Active Networks, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015)................................................................. passim

*Internet Patents Corp. v. Gen. Auto. Ins. Servs., Inc.*,
  29 F. Supp. 3d 1264 (N.D. Cal. 2013), *aff'd*, 790 F.3d 1343 (Fed. Cir. 2015)....56

*IpLearn, LLC v. K12 Inc.*,
    76 F. Supp. 3d 525 (D. Del. 2014) ............................................................. 30, 39

*Kaavo, Inc. v. Cognizant Tech. Solutions Corp.*,
    No. 14-1192, 2016 WL 1268308 (D. Del. Mar. 31, 2016) ...................................25

*Kaavo, Inc. v. Cognizant Tech. Solutions Corp.*,
    No. 14-1192, 2016 WL 476730 (Feb. 5, 2016) ...................................................25

*Kickstarter, Inc. v. Fan Funded, LLC*,
    No. 11 Civ. 6909, 2015 WL 3947178 (S.D.N.Y. June 29, 2015)........................56

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) .............................................................................. passim

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ................................................................... 17, 54, 55, 56

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*,
    No. 13-1747, 2015 WL 436160 (D. Del. Jan. 27, 2015) ............................. 23, 49

*O'Neal v. McAninch*,
    513 U.S. 432 (1995) ...........................................................................................55

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 701 (2015)..... 17, 54, 57

*Parker v. Flook*,
    437 U.S. 584 (1978) ................................................................................... 30, 38

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. 2014) ..................................................................29

*Shortridge v. Found. Constr. Payroll Serv., LLC*,
    No. 14-CV-04850, 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015)......................38

*SkillSurvey, Inc. v. Checkster LLC*,
    No. 15-1766, 2016 WL 1255785 (E.D. Pa. Mar. 31, 2016) ...............................29

*Source Search Techs., LLC v. Kayak Software Corp.*,
    111 F. Supp. 3d 603 (D.N.J. July 1, 2015) ........................................................49

*Telebuyer, LLC v. Amazon.com, Inc.*,
  No. 2:13-cv-1677, 2015 WL 4493045 (W.D. Wash. July 23, 2015)...................31

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015) ............................................................................55

*TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*,
  No. 11 CIV. 4039, 2016 WL 817447 (S.D.N.Y. Feb. 22, 2016)........................56

*Tranxition, Inc. v. Lenovo (U.S.) Inc.*,
  No. 3:12-cv-01065, 2015 WL 4203469 (D. Or. July 9, 2015) ...........................56

*Ultramercial, Inc. v. Hulu, LLC*,
  722 F.3d 1335 (Fed. Cir. 2013)..............................................................17

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014)................................................... passim

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
  No. 2015-1411, 2015 WL 9461707 (Fed. Cir. Dec. 28 2015)...........................32

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
  793 F.3d 1306 (Fed. Cir. 2015).................................................. 24, 50

*VirtualAgility Inc. v. Salesforce.com, Inc.*,
  759 F.3d 1307 (Fed. Cir. 2014).................................................. 21, 34

*WildTangent, Inc. v. Ultramercial, LLC*,
  134 S. Ct. 2870 (2014) .........................................................................17

*Young v. Lumenis, Inc.*,
  492 F.3d 1336 (Fed. Cir. 2007)..............................................................54

## STATUTES

28 U.S.C. § 1295(a)(1) ............................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1338(a) ................................................................................3

35 U.S.C. § 101 ........................................................................ passim

**RULES**

Fed. R. Evid. 201(b) ............................................................................. 21, 34

## STATEMENT OF RELATED CASES

An appeal from this action was previously before this Court in *Trading Technologies Int'l, Inc. v. CQG, Inc. and CQGT, LLC*, No. 2015-1277, an interlocutory appeal from the district court's denial of a motion to stay. That appeal was terminated on July 8, 2015, prior to oral argument. No decision was issued in the case.

U.S. Patent Nos. 6,772,132 and 6,766,304 (collectively, "the patents-in-suit") were previously before this Court on issues related to infringement and invalidity under 35 U.S.C. §§ 102 and 112 in *Trading Techs. Int'l, Inc. v. SunGard Data Sys., Inc.*, Nos. 2015-1767, -1768 (Fed. Cir. Apr. 4, 2016) and *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010). U.S. Patent No. 6,766,304 was also before this Court in *In re Trading Techs. Int'l, Inc.*, No. 2016-120 (Fed. Cir. Mar. 18, 2016), on a petition for a writ of mandamus to the Patent Trial and Appeal Board ("PTAB") of the U.S. Patent and Trademark Office regarding institution of a covered business method review ("CBMR") trial.

All claims of the patents-in-suit are currently before the PTAB in instituted CBMR trials CBM2016-00035, CBM2015-00182, and CBM2015-00161, where the PTAB has found "it is more likely than not that the challenged claims are unpatentable under 35 U.S.C. § 101." Appx3129; *see also* Appx3359-60,

Appx3149.  These proceedings may be directly affected by this Court's decision in the pending appeal.

U.S. Pat. No. 7,676,411 is related to the patents-in-suit, sharing the same specification and describing a nearly identical purported invention.  Appx3373-74. It previously was before this Court in *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309 (Fed. Cir. 2013), and currently is before the PTAB in an instituted CBMR trial CBM2015-00181, where the PTAB has found "it is more likely than not that the challenged claims are unpatentable" under §§ 101 and 103. Appx3323, Appx3356.  This proceeding may be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

For hundreds of years, individuals and companies have participated in commodities trading through a commodities exchange. Participation requires traders to exchange offers to buy and sell a specific commodity at different prices and quantities. Where offers to buy and sell match, a contract is created between two traders. For a trader to be successful, she must have accurate and timely information about the commodities market, and must be able to relay her trade to the market in an accurate and timely manner.

The patent claims asserted in this case, at their core, are directed to such well-known commodities trading concepts. The claims cover a method using a graphical user interface ("GUI") that displays and updates market information for a commodities exchange and allows users to place a trade order. In simple terms, the claims recite displaying market information in a grid.

Under well-settled U.S. Supreme Court and circuit precedent, these claims are not patent-eligible because they cover nothing more than "a fundamental economic practice," which is an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014). Nor do the claim elements, taken individually or as an ordered combination, add "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (citation omitted). All they do is take long-known business and economic principles and

1

attempt to implement them on a computer. But merely requiring "generic computer implementation[] fail[s] to transform that abstract idea into a patent-eligible invention." *Id*. Because the asserted claims improperly attempt to capture and control abstract ideas fundamental to the commodities trading process, they fail the Supreme Court's two-step *Alice* test for determining patent-eligibility under 35 U.S.C. § 101.

The district court made numerous errors in its analysis. At *Alice* step one, it improperly focused on the relatively recent development of electronic commodities trading, instead of considering its analogue in centuries-old, non-electronic commodities trading. Yet, numerous courts have held claims describing a process used to generate price quotes for various types of financial products, based on a given set of criteria, are directed to a fundamental economic practice and therefore to an abstract idea. The district court further erred by relying on the alleged novelty and non-obviousness of the claims and on a supposed lack of complete preemption—which is not the law for patent-eligibility under § 101. At *Alice* step two, the only "inventive concept" the district court identified—the "static price index" of the claims—is not actually inventive. The claims just recite methods for arranging market data through a GUI, but merely providing an allegedly new way to display market data is not inventive.

2

The district court compounded its errors by applying a "clear and convincing" evidentiary burden to the legal question of patent-eligibility under § 101, after acknowledging that patent-eligibility is a question of law.  Appx3-4.

This Court should reverse the judgment and find that the challenged claims are not directed to patent-eligible subject matter under § 101.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).  The district court issued its final judgment on February 17, 2016, and CQG, Inc. and CQG, LLC timely filed their notice of appeal on February 23, 2016. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether claims 1 and 8 of U.S. Patent No. 6,772,132 and claims 1 and 27 of U.S. Patent No. 6,766,304 are directed to patent-ineligible subject matter and therefore invalid under 35 U.S.C. § 101, where: (a) the claims are directed to the abstract idea of displaying and updating market information for a commodities exchange, and placing an order based on that market information, (b) the claims require, at most, data gathering, organization, and display using generic computer equipment and software that does not add an "inventive step" to that abstract idea, and (c) the claims fail this Court's "machine-or-transformation" test.

2.    Whether the district court erroneously applied a clear and convincing evidentiary standard in determining, as a matter of law, that the challenged claims are patent-eligible under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

On August 19, 2005, Trading Technologies International, Inc. ("TT") sued CQG, Inc. and CQG, LLC (f/k/a CQGT, LLC) (collectively, "CQG") in the U.S. District Court for the Northern District of Illinois, accusing CQG of infringing U.S. Pat. Nos. 6,772,132 ("the '132 patent") and 6,766,304 ("the '304 patent"). Appx33, Appx253-55.    CQG answered TT's complaint, asserting affirmative defenses and counterclaims of non-infringement and invalidity.    Appx35, Appx261-63.  TT answered CQG's counterclaims.  Appx35.

On January 26, 2015, the district court granted CQG leave to file a brief in support of its claim that the asserted claims of the patents-in-suit are patent-ineligible under § 101.  Appx138.  After the parties completed briefing (Appx138, Appx145, Appx153), the district court held a hearing on CQG's § 101 challenge (Appx138, Appx156).  The next day, the district court held, as a matter of law, that the asserted claims were "not directed to an abstract idea, and even if they were, an element of the claims recite an inventive concept."  Appx9, Appx10.  The district court then held a jury trial on the remaining issues of infringement, validity, and damages, and entered final judgment in TT's favor on February 17, 2016.

4

Appx10-11.  CQG timely filed its Notice of Appeal to this Court on February 23, 2016.  Appx193.

## STATEMENT OF FACTS

### I.    COMMODITIES TRADING

Commodities trading is centuries old, occurring on exchanges in New York as early as 1725, and even earlier in Continental markets.  Appx800-801.  The Chicago Butter and Egg Board "was founded in 1898 and evolved into the Chicago Mercantile Exchange (now CME) in 1919."  Appx806.  CME is a commodities exchange that began trading agricultural commodities and later expanded into trading futures on precious metals, currencies, and other financial instruments. Appx806-07.

A commodities market relies on bids and asks to function.  Appx202 at 2:13-16, Appx218 at 2:19-22.  A bid is an offer to buy a specified quantity of a commodity at a particular price and an ask is an offer to sell a specified quantity of a commodity at a particular price.  Appx203 at 4:56-58, Appx219 at 4:60-62.  The aggregate of all bid and ask prices and quantities is called the "market depth."  *Id*. The price of the highest current bid ("best bid price") and the price of the lowest current ask ("best ask price") is known as the "inside market."  Appx203 at 4:58-60, Appx219 at 4:62-64.  The inside market changes as the best bid and best ask prices in the market rise and fall.  Appx205 at 8:38-39, Appx222 at 9:4-5.

Originally, commodities trading was done in pits, where traders of a particular commodity would stand together and communicate using specialized, standardized hand signals and verbal outcries. Appx979 at ll. 12-23, Appx2559-60 at 307:25-308:18, Appx2562 at ll. 7-11. Through this "negotiation process," if a buy price and sell price matched, then a transaction was done. Appx2558-59 at 306:21-307:2. Commodities trading eventually migrated to an electronic system, almost completely replacing pit trading. Appx2564 at ll. 7-19. Like the pits, electronic commodities trading involves a centralized auction process, but "here the central place isn't a pit on the floor; it's a computer, a computer server." Appx2564 at ll. 17-19 (testimony of Dr. Pirrong, TT's expert). Rather than shout a bid or ask in the pit, a trader submits an order with a bid or ask to a centralized exchange computer. Appx2564-65 at 312:13-313:8. The computer determines whether there is a match between a bid and ask and, if so, creates a transaction. *Id.*

## II.   THE PATENTS-IN-SUIT

The patents-in-suit are "directed to the electronic trading of commodities." Appx202 at 1:12-13, Appx218 at 1:16-17. Both patents are titled "Click Based Trading with Intuitive Grid Display of Market Depth," and, other than different priority statements, have identical specifications. Appx194, Appx210. As the district court explained, both patents-in-suit "are directed to '[c]lick based trading with intuitive grid display of market depth.'" Appx1 (quoting Appx202 at 1:2-3).

6

Claims 1 and 8 of the '132 patent and claims 1 and 27 of the '304 patent (collectively, "the challenged claims") are at issue in this appeal. The parties agree that claim 1 in each patent is representative for the § 101 analysis. Appx1-2, Appx1475. In other words, claim 8 of the '132 patent rises and falls with claim 1 of the '132 patent, and claim 27 of the '304 patent rises and falls with claim 1 of the '304 patent.

Claim 1 of the '304 patent claims a "method for displaying market information" of a "commodity being traded in an electronic exchange," and sending a trade order to the exchange. The claimed method uses a GUI to display a "static price axis," which displays a fixed list of prices, and "an order entry region" corresponding to each price. The claimed GUI also dynamically displays bids and asks associated with each price. The claimed GUI further allows a trader to "set[]" trade order parameters and "send[]" the trade order to the exchange. The claimed method recites steps long-known in non-electronic commodities trading—displaying market information and placing trade orders—and adds the requirement that the steps be performed on a computer, without identifying any specialized computer equipment or programming for executing the method:

> **1.** A method for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the method comprising:

7

[a] dynamically *displaying* a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;

[b] dynamically *displaying* a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the common static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;

[c] *displaying* the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis;

[d] *displaying* an order entry region comprising a plurality of locations for receiving commands to send trade orders, each location corresponding to a price level along the common static price axis; and

[e] in response to a selection of a particular location of the order entry region by a single action of a user input device, *setting* a plurality of parameters for a trade order relating to the commodity and *sending* the trade order to the electronic exchange.

Appx223-224 at 12:37-13:3 (lettering and emphasis added).

Claim 1 of the '132 patent claims a "method of placing a trade order" on an electronic commodities exchange. The claimed method uses a GUI to display a

"static display of prices" and "an order entry region" corresponding to each price. The claimed GUI also dynamically displays the market depth (bids and asks) of a commodity, aligned with the static display of prices. The claimed GUI further allows a trader to "set[]" trade order parameters and "send" the trade order to the exchange. The claimed method recites steps long-known in non-electronic commodities trading—displaying market information and placing trade orders—and adds the requirement that the steps be performed on a computer, without identifying any specialized computer equipment or programming for executing the method:

> **1.** A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface and a user input device, said method comprising:
>
> [a] *setting* a preset parameter for the trade order;
>
> [b] *displaying* market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including at least a portion of the bid and ask quantities of the commodity, the dynamic display being aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;
>
> [c] *displaying* an order entry region aligned with the static display prices comprising a plurality of areas for receiving commands from the user input devices to send trade orders, each area corresponding to a price of the static display of prices; and

[d] *selecting* a particular area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and *send* the trade order to the electronic exchange.

Appx207 at 12:2-26 (lettering and emphasis added).

The GUI in the representative claims displays market information. Appx207 at claim 1, Appx194 at Abstract, Appx223-24 at claim 1, Appx210 at Abstract. The claims do not recite the source of the market information that is displayed, but the common specifications explain that the GUI receives that market information from an electronic exchange. Appx202 at 2:11-16 Appx218 at 2:17-22 (the electronic exchange "supplies and requires the same information to and from every trader," and "everyone logged on to trade can receive [the bids and asks that make up the market data] if the exchange provides it.").

The representative claims require displaying a static display of prices (or "static price axis") while dynamically displaying market depth (bids and asks), along with an order entry region, aligned with the static display of prices. Appx207 at claim 1, Appx223-24 at claim 1. Figures 3 and 4 of the common specifications illustrate the display "of the present invention" in its preferred vertical grid embodiment. Appx203 at 3:41-42, Appx205 at 7:29-34, Appx219 at 3:45-46, Appx221 at 7:49-54:

10



**FIG. 3**

**FIG. 4**

Appx198-99, Appx214-15.  The "Prc" column lists the range of prices at which a commodity might trade.  Appx205 at 7:29-38, Appx221 at 7:49-58.  The "BidQ" column lists the bid quantities corresponding to the price value in that row, and the "AskQ" column lists the ask quantities corresponding to the price value in that row.  Appx205 at 7:35-36, Appx221 at 7:55-56.  The quantity values in the BidQ and AskQ columns are dynamic, moving vertically up and down as the market depth for the commodity changes.  Appx207 at claim 1, Appx205 at 7:48-51, Appx223-24 at claim 1, Appx221 at 7:67-8:18.  In contrast, the display of values in the Prc column is static; the values do not move up and down in response to

11

changes in the market.  Appx207 at claim 1, Appx205 at 7:46-48, Appx223-24 at claim 1, Appx221 at 7:65-67.

This display of static and dynamic values is illustrated by comparing Figures 3 and 4 of the patents-in-suit, where the values in the price column stay in the same location, but the values in the bid and ask columns move.  *See* Appx198-99, Appx214-15, Appx203 at 3:41-44, Appx219 at 3:45-48 (Fig. 4 "show[s] the movement of values when compared to Fig. 3"), Appx205 at 8:38-48, Appx222 at 9:4-14 ( "Fig. 4 shows a screen displaying the same market as that of Fig. 3 but at a later interval where the inside market, cells 1101, has risen three ticks.").  In Figure 3, the lowest current ask in column AskQ is at a price of 90 and the highest current bid in column BidQ is at a price of 89.  Appx198, Appx214.  In Figure 4, the lowest current ask in column AskQ has risen to a price of 93, and the price of the highest current bid in column BidQ has risen to 92.  Appx199, Appx215.  The values in the Prc column are static and do not change in response to this change in the inside market.  *Compare* Appx198 ('132 patent Fig. 3), Appx214 ('304 patent Fig. 3) *with* Appx199 ('132 patent Fig. 4), Appx215 ('304 patent Fig. 4).

The representative claims also allow traders to enter orders using the GUI. Appx207 at claim 1, Appx223-24 at claim 1.  An electronic exchange requires the same information be provided for every order from every trader, which includes "the name of the commodity, quantity, restrictions, price and multiple other

12

variables." Appx202 at 2:16-22, Appx218 at 2:22-28. A trader can create an order at a particular price using pre-set trade parameter(s)—such as the name of the commodity, quantity, and price—and submit it to the exchange by a "single action" of a "user input device" (such as a mouse), for example, by single- or double-clicking on a bid quantity in the BidQ column corresponding to the price. Appx207 at claim 1, Appx203 at 4:15-19, Appx223-24 at claim 1, Appx219 at 4:19-23.

The representative claims do not identify any specialized computer equipment or software for implementing the claimed methods. *See generally* Appx207 at claim 1, Appx223-24 at claim 1. The common specifications explain that the market data from the electronic exchange is mapped into the fields in the GUI "through simple algorithms and mapping tables to positions in a theoretical grid program or any other comparable mapping technique for mapping data to a screen," Appx203 at 4:62-66, Appx219-220 at 4:66-5:3, such that "[a]ny technique known to those skilled in the art" may be used to map the market data to the display, Appx203-204 at 4:61-5:3, Appx219-220 at 4:66-5:7. The specifications state that the claimed GUI is preferably implemented on "a computer or electronic terminal" which can be "any existing or future terminal or device with the processing capability to perform the functions described herein." Appx203 at 3:64-4:7, Appx219 at 4:1-11.

13

## III.   THE DISTRICT COURT'S RULING

The district court found the claims patent-eligible under § 101.  In so doing, it held that CQG had the burden of proving the claims ineligible by "clear and convincing evidence," despite acknowledging that patent-eligibility is a question of law.  Appx3-4, 7.

The district court first found that the claims are not directed to an abstract idea.  At *Alice* step one, it reasoned that "neither the claims in the '132 patent nor the claims in the '304 patent are directed to a mathematical algorithm."  Appx5. Despite the long history of commodities trading, it concluded that "[t]he claims similarly do not 'recite a fundamental economic or longstanding commercial practice,' as electronic trading has only been viable for a couple of decades." Appx5-6.  The district court further found that because the claims required use of a GUI, they were distinguishable from an abstract idea.  Appx6.  Finally, it found that because the claims "do not preempt every way of 'placing an order for a commodity on an electronic exchange,'" the patents-in-suit are not directed to an "abstract idea."  Appx7.

At *Alice* step two, the district court found that the claims recited an "inventive concept" by relying on the "static price index" elements as an improvement to using prior art GUIs.  Appx8-9.  Quoting this Court's decision in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the

district court reasoned that "the claims of both the '132 patent and the '304 patent are 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of' computers."  Appx9.

In reaching its conclusions, the district court did not consider or apply the machine-or-transformation test.

## SUMMARY OF THE ARGUMENT

The challenged claims fundamentally fail both steps of the *Alice* test and should be held, as a matter of law, to be patent-ineligible.  They fail *Alice* step one because, at their core, they are directed to the abstract idea of displaying and updating market information for a commodities exchange, and placing an order based on that market information.  Commodities trading is "a fundamental economic practice long prevalent in our system of commerce," and is an abstract idea similar to those courts have repeatedly held abstract and ineligible.  *Alice*, 134 S. Ct. at 2356.  The challenged claims are little more than a method for using a GUI to display and update market information, a form of data organization that is also an abstract idea.  *See CyberSource, Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011).

The district court's holding under *Alice* step one that the challenged claims are **not** directed to an abstract idea cannot be sustained.  It ignored CQG's description of the abstract idea of the challenged claims, analyzed the

15

technological environment of the challenged claims rather than the core of the invention, impermissibly assessed the alleged novelty and nonobviousness of the claims when determining patent-ineligibility, and improperly considered whether the claims completely preempt commodities trading.

The challenged claims fail *Alice* step two because the claim elements, individually and as an ordered combination, do not add an "inventive concept" to the abstract idea of commodities trading. The district court's holding that the claims include an inventive concept was based upon two legal errors. *First,* the "static price index" that the district court held as a matter of law was the sole inventive concept is nothing more than a way of organizing market information in a tabular or grid format. It is not inventive. *Second*, the district court's heavy reliance on *DDR Holdings* was misplaced because the challenged claims have pre-Internet analogues and are not "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257.

Finally, the district court erred when it required CQG to prove patent-ineligibility by clear and convincing evidence. Patent-eligibility is a question of law, whereas "clear and convincing" is an evidentiary burden of proof applicable to factual disputes. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253

(2011) (Breyer, J., concurring, joined by Scalia and Alito, JJ.).    Applying the
proper legal standard, the challenged claims should be held patent-ineligible.

## STANDARD OF REVIEW

Whether a patent claims ineligible subject matter under § 101 is an issue of
law this Court reviews *de novo* and without deference.    *OIP Techs., Inc. v.
Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct.
701 (2015); *CyberSource*, 654 F.3d at 1369.    An evidentiary burden of proof
"applies to questions of fact and not to questions of law."    *Microsoft,* 131 S. Ct. at
2253 (Breyer, J., concurring).    The proper evidentiary burden to apply to any
factual issues underlying the legal question of patent-eligibility is an open
question.    *Compare Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 720 (Fed. Cir.
2014) (Mayer, J., concurring) ("[N]o presumption of eligibility should attach when
assessing whether claims meet the demands of section 101."), *with Ultramercial,
Inc. v. Hulu, LLC,* 722 F.3d 1335, 1342 (Fed. Cir. 2013) (reasoning that
"application of this [validity] presumption and its attendant [clear and convincing]
evidentiary burden is consistent with the Supreme Court's admonition to cabin
exceptions to § 101"), *vacated and remanded sub nom. WildTangent, Inc. v.
Ultramercial, LLC*, 134 S. Ct. 2870 (2014).

17

**ARGUMENT**

## I.   THE DISTRICT COURT ERRED IN FINDING THE CHALLENGED CLAIMS PATENT-ELIGIBLE UNDER § 101.

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  However, as the Supreme Court has repeatedly held, § 101 "contains an important implicit exception" for abstract ideas, *Alice*, 134 S. Ct. at 2354, which are not patent-eligible as a matter of law because they are basic tools in the "storehouse of knowledge" that are "free to all … and reserved exclusively to none." *Bilski v. Kappos*, 561 U.S. 592, 602 (2010) (citation omitted); *see also Alice*, 134 S. Ct. at 2354; *Gottschalk v. Benson*, 409 U.S. 63, 71 (1972).  The Supreme Court's two-step *Alice* framework governs the § 101 analysis. *Alice*, 134 S. Ct. at 2355.

At *Alice* step one, the court asks whether the challenged claims are, at their core, directed to an abstract idea. *Id.*  "Patents that merely claim well-established, fundamental concepts fall within the category of abstract ideas." *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991 (Fed. Cir. 2014); *see also Bilski*, 561 U.S. at 611 ("fundamental economic practice" is an abstract idea).  "An abstract idea does not become nonabstract by limiting [it] to a … technological environment, such as the Internet." *Intellectual Ventures I LLC v.*

18

*Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("*Capital One*"). The court must determine whether, notwithstanding computer implementation, the "heart" of the claims amounts to an abstract idea. *Ultramercial,* 772 F.3d at 714-15 (eleven-step claim is at heart directed to abstract idea), *cert. denied*, 135 S. Ct. 2907 (2015); *see also Internet Patents Corp. v. Active Networks, Inc*., 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("basic character of the subject matter" of Internet claims is abstract idea); *Accenture Global Servs., GmbH v. Guidewire Software, Inc*., 728 F.3d 1336, 1344-45 (Fed. Cir. 2013) (heart of computer claims is abstract idea); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (multi-step claim in its "simplest form" is directed to abstract idea).

At *Alice* step two, the court must determine whether the challenged claims add "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294, 1298 (2012)). The prohibition on patenting abstract ideas cannot be circumvented through mere "draftsman's art," or by trying to dress up an abstract idea with inconsequential steps or features. *Alice*, 134 S. Ct. at 2359. Taking an abstract idea and adding "well-understood," "routine," or "conventional" activities or features "previously known to the industry" contributes nothing inventive. *Id.* Patentees cannot merely recite generic computer functions and components at a

19

high level of generality—like a "'software' 'brain,'" *see Capital One*, 792 F.3d at 1370-71—to perform the idea without specifying "how [it is] specially programmed to perform the steps claimed," *Dealertrack*, 674 F.3d at 1333 (citation omitted), or "how the result is accomplished," *Internet Patents*, 790 F.3d at 1348.

The challenged claims are directed to the idea of displaying the current market price, bids, and asks of a commodity (e.g., corn) and entering (i.e., placing) an order to buy or sell that commodity on an electronic exchange (e.g., the Chicago Mercantile Exchange or "CME"). This is a fundamental economic practice, basic and long prevalent in our system of commerce, a classic abstract idea. All elements of the challenged claims, individually and as an ordered combination, are well-known and do not add an inventive concept. The challenged claims thus fail both steps of the *Alice* analysis. In reaching a contrary conclusion, the district court misapplied the law at both steps.

### A.   *Alice* Step One: The Claims Are Directed To An Abstract Commodity-Trading Idea.

At their core, the challenged claims are directed to displaying and updating market information for a commodities exchange, and placing an order based on that market information. *See* Appx207 at claim 1, Appx223-24 at claim 1. This long-followed, fundamental economic practice is an abstract idea.[1] In reaching a

---

[1]   The PTAB's decisions instituting § 101 CBMR trials of all claims of both patents-in-suit support the conclusion that under a proper § 101 analysis, the

contrary conclusion, the district court oversimplified CQG's arguments, analyzed the technological environment of the claims rather than the core of the invention, impermissibly assessed the alleged novelty and nonobviousness of the claims, and improperly focused on whether the challenged claims completely preempt commodities trading.

### 1. The Challenged Claims Are Directed To Commodities Trading, A Fundamental Economic Practice And Abstract Idea.

The representative claims recite methods for "displaying market information relating to … a commodity being traded in an electronic exchange" and "placing a trade order for a commodity on an electronic exchange." Appx207 at claim 1, Appx223-24 at claim 1. The elements of the representative claims include the steps necessary to carry out the abstract idea of displaying and updating market information for a commodities exchange, and placing an order based on that

challenged claims are directed to an abstract idea. The PTAB observed that in the '132 patent, "the concept embodied by the majority of the limitations describes only the abstract idea of displaying market information to facilitate setting parameters and placing a trade order." Appx3126; *see also* Appx3170 ("we are persuaded by Petitioner that the claims of the '304 patent are directed to [a] fundamental economic practice"). While these institution decisions were not before the district court, this Court may take judicial notice of these decisions. *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1312-13 (Fed. Cir. 2014); Fed. R. Evid. 201(b). In the institution decision that was before the district court, the PTAB also found the claims directed to an abstract idea. Appx752 ("we are persuaded by Petitioner that claim 1 [of the '132 patent] is directed to the abstract idea of placing an order based on observed market information, as well as updating the market information"); Appx1585-87 (discussing institution decision at § 101 hearing).

market information.  The claims recite "displaying" market depth (bids and asks) aligned with a static display of prices for a commodity.  Appx207 at claim 1, Appx223-24 at claim 1.  As the common specifications explain, this basic market data (bids, asks, and prices) is supplied by "each market" to "every trader." Appx202 at 2:11-22, Appx218 at 2:16-27.  The claims also recite displaying an "order entry region" in which a trader sets parameters for placing a trade order, and "sending" the trade order to the electronic exchange.  Appx207 at claim 1, Appx223-24 at claim 1.  These steps are a necessary part of the basic economic practice of commodities trading, however, as "every exchange requires that certain information be included in each order." Appx202 at 2:16-22, Appx218 at 2:21-27.

Trading on commodities exchanges dates back over 100 years.  Appx806 (Chicago commodities exchange opened in 1898), *see also* Appx800-01 (commodities traded as far back as 1725).  The Supreme Court also cited an article in *Alice*, to support its holding that intermediated settlement was a "fundamental economic practice," which further illustrates the age and fundamental economic nature of commodities trading.  *Alice*, 134 S. Ct. at 2356 (citing article from 1896 titled "Speculation on the Stock and Produce Exchanges of the United States").  Today substantially all commodities trading is done electronically.  As the patents-in-suit acknowledge, there were at least 60 exchanges around the world that used electronic trading at the time of the application.  Appx202 at 1:21-23, Appx218 at

1:26-28.    Commodities trading is one of those "well-established, fundamental concepts [that] fall within the category of abstract ideas." *Cyberfone, Inc.*, 558 F. App'x at 991; *see also Alice*, 134 S. Ct. at 2353-54 (intermediated settlement is abstract idea); *Bilski*, 561 U.S. at 611 (hedging risk is abstract idea); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351, 1355 (Fed. Cir. 2014) (claims reciting "steps for guaranteeing a party's performance of its online transaction" are directed to a "long-familiar commercial transaction[]" and are abstract); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-1747, 2015 WL 436160, at *3 (D. Del. Jan. 27, 2015) (claims describing "a process used to generate price quotes for various types of financial products, based on a given set of criteria," are directed to a fundamental economic practice "and therefore an abstract idea").

### 2.    The "Vintage" Of An Abstract Idea Or Fundamental Economic Practice Is Irrelevant.

The district court incorrectly concluded that the challenged claims are not directed to a fundamental economic practice because "electronic trading has only been viable for a couple of decades, and its analogue predecessor, open outcry trading systems, operate in a significantly different fashion." Appx5-6.    The migration of a longstanding economic practice into the digital age, however, does not change the § 101 analysis.    *See, e.g., Alice*, 134 S. Ct. at 2355-56; *Ultramercial*, 772 F.3d at 714-15.

The Supreme Court and this Court have found ideas to be abstract even when the claims were limited to technological advances of much more recent vintage than electronic commodities trading. For example, in *Alice*, the claims were directed to "a ***computer-implemented scheme***" for mitigating settlement risk. *Alice*, 134 S. Ct. at 2351-52 (emphasis added). The Supreme Court found the claims were directed to the abstract idea of intermediated settlement, even though such computer-implemented schemes are a relatively recent technological advance and would operate differently than pre-computer intermediated settlement. *Id.* at 2355-56.

Similarly, in *Ultramercial,* the claims were directed to "a method for distributing copyrighted media products ***over the Internet***." 772 F.3d at 712 (emphasis added). This Court concluded that the claims were directed to the abstract idea of using advertising as an exchange or currency, even though the Internet is a relatively recent technology and using the Internet would cause the claimed method to operate differently than its analogue equivalent. *Id.* at 714–15; *see also Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1334 (Fed. Cir. 2015) (processing data by computer is an abstract idea); *Capital One*, 792 F.3d at 1369 (customizing and displaying web pages is an abstract idea); *Content Extraction & Transmission LLC v. Well Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (organizing and storing digital data from documents is an

24

abstract idea); *buySAFE*, 765 F.3d at 1355 (guaranteeing performance of an online transaction is an abstract idea).

District courts have also concluded that the relative vintage of an abstract idea is irrelevant. *See, e.g., Kaavo, Inc. v. Cognizant Tech. Solutions Corp.*, No. 14-1192, 2016 WL 476730, at *7 (Feb. 5, 2016) (M.J. Report and Recommendation) (observing, based on *Internet Patents*, 790 F.3d at 1348, and *Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553, 562-63 (D. Del. 2014), that "nowhere have courts concluded that a patent claim *cannot* be directed to an abstract idea if the claim relates to a field that is of somewhat recent vintage"), *adopted Kaavo, Inc. v. Cognizant Tech. Solutions Corp.*, No. 14-1192, 2016 WL 1268308, at *2 (D. Del. Mar. 31, 2016).

At best, limiting the abstract idea in the challenged claims to electronic commodities trading merely limits the idea to a particular "technological environment," which does not make it "any less abstract." *Capital One*, 792 F.3d at 1366-67. In *Capital One*, the claims recited organizing and modifying data in a Hypertext-Markup Language (HTML) document (i.e., web page) and displaying it for the user in an "interactive interface." 792 F.3d at 1369, 1372. This Court found the claims directed to the abstract concept of tailoring content based on user characteristics that humans long used in newspapers and television—an idea that "does not become nonabstract by limiting the invention to a particular field of use

or technological environment, such as the Internet." *Id.* at 1369-70, 1366; *see also Dealertrack*, 674 F.3d at 1334 (limiting the claimed clearinghouse to car loans does not "confer patent eligibility," because "using a clearinghouse generally and using a clearinghouse specifically to apply for car loans" "is of no consequence"). The same conclusion follows here: limiting the challenged claims to the "technological environment" of electronic commodities trading does not make the underlying idea any less abstract.

### 3. The Details Of The Challenged Claims Are Similarly Abstract.

The district court criticized CQG for allegedly ignoring "details" of the challenged claims when stating the abstract idea. Appx6. Although this focus on the detailed claim elements is more properly considered under *Alice* step two, the district court incorrectly concluded that the details of the claims alter the conclusion that they are directed to an abstract idea. Collectively, the claims recite steps that are nothing more than necessary elements of any electronic commodities trading system, and are the kinds of data organization this Court has found to be patent-ineligible in numerous cases. *E.g.*, *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) ("organizing information through mathematical correlations" is abstract); *CyberSource*, 654 F.3d at 1375 ("[t]he mere collection and organization of data" is not patent-

eligible). The "details" of the challenged claims are nothing more than necessary parts of the claimed abstract idea, and abstract ideas in and of themselves.

Trading is inherently based on a trader having knowledge of the market's bids, asks, and prices. *See* Appx202 at 2:1-22, Appx218 at 2:6-27. Displaying data about a commodity market's depth, as the claimed GUI does (Appx207 at claim 1, Appx223-24 at claim 1), is an abstract idea because it is a "fundamental economic practice long prevalent in our system of commerce." *Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611.

The "detail" that the claimed display of market data aligns dynamic bids and asks with a static price index does not change this conclusion. *See* Appx6, Appx207 at claim 1, Appx223-24 at claim 1. This is just another abstract idea about how to organize and display market data. People have been aligning market information, dynamically and statically, since the existence of trading markets. Picture a commodities exchange, with a bulletin board for displaying market information. Some information, such as market price, is displayed dynamically as the price changes throughout a day's trading. Other information, such as the commodity being traded, is displayed statically. This mixture of dynamic and static display is the same whether the bulletin board is a chalkboard or an electronic display. Because this type of data organization and display is such a longstanding concept, this Court has found inventions that perform basic data

27

sorting to be abstract.  *Content Extraction*, 776 F.3d at 1347.  Permitting a patent to cover something as basic as the alignment of market data, statically or dynamically, would remove from the "storehouse of knowledge" numerous applications, even within the commodities trade itself.  *Bilski*, 561 U.S. at 602.

In any sale or trade, the parties must agree on the price and quantity of the good to be exchanged at that price before the transaction can occur.  Selecting and setting parameters about price and/or quantity, as a trader using the claimed GUI does (Appx207 at claim 1, Appx223-24 at claim 1), is an abstract idea because parameters about the price and/or quantity are data points required for *any* trade to be completed.  And sending the trade order to the exchange as recited in the representative claims is an abstract idea because there must be agreement between the parties to a trade before it is executed.  The common specifications also admit these are well-known, common practices.  *See* Appx202 at 1:59-60, Appx218 at 1:65-66 (known trading GUIs "enable traders to enter and execute orders, obtain market quotes, and monitor positions").

The "details" of the claims also merely use a computer to automate steps that "can be performed in the human mind, or by a human using a pen and paper." *CyberSource*, 654 F.3d at 1372-73.  A trader supplied with market data could mentally keep track of market depth, adding the bid or ask quantity at a particular price each time new data is supplied by the exchange, much like card-counting in

blackjack.   TT's trial expert, Christopher Thomas, agreed, noting that "some people could" keep track of market activity with this kind of "mental arithmetic." Appx2796 at ll. 10-24.   A trader could alternatively use a chalkboard or piece of paper to track the market, erasing and updating bid/ask quantities with new data reported by the exchange, in the same way the claimed GUI does.   These steps that could be carried out mentally, or using a pen and paper, do not alter the conclusion that the claims are directed to an abstract idea.   *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (finding claims for managing a bingo game directed to an abstract idea because steps could be carried out mentally or using pen and paper) (citation omitted); *SkillSurvey, Inc. v. Checkster LLC*, No. 15-1766, 2016 WL 1255785, at *6 (E.D. Pa. Mar. 31, 2016) (finding claims to be abstract where "alone and in combination, [they] could all be completed by the human mind" and "[a] pen and paper version of the claimed method would not be particularly efficient, but it could be completed").

Contrary to the district court's holding, there are no "details" in these claim elements that direct the challenged claims to anything other than an abstract idea.

### 4.    Claims Directed To An Abstract Idea Remain Abstract Even If They Purportedly Solve A Problem In The Art.

Although not relevant to a § 101 analysis, the district court also found the claims "solve problems of prior graphical user interface devices (GUIs), in the context of computerized trading, relating to speed, accuracy and usability," and

were therefore not directed to an abstract idea. Appx6. This was yet another error in the district court's analysis of *Alice* step one.

The Supreme Court long ago settled that § 101 "does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103 when the validity of a patent is challenged." *Parker v. Flook*, 437 U.S. 584, 588 (1978); *see also Diamond v. Diehr*, 450 U.S. 175, 190 (1981) (novelty is "wholly apart from whether the invention falls into a category of statutory subject matter.") (citation omitted). Whether or not the patents-in-suit "profess to solve problems of prior graphical user interface[s]" (Appx6) is not relevant to, let alone dispositive of, the inquiry into whether the claims are directed to an abstract idea. *Ultramercial*, 772 F.3d at 714-15 ("We do not agree with Ultramercial that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete."); *IpLearn, LLC v. K12 Inc.*, 76 F. Supp. 3d 525, 534 (D. Del. 2014) (citing *Ultramercial*, 772 F.3d at 714-15, to find that "[a] new idea, *i.e.*, one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible.").

Consistent with this precedent, district courts reviewing claims directed to GUIs have found patent-ineligibility despite the potential novelty or nonobviousness of the claims. For example, in *Advanced Auctions LLC v. eBay, Inc.*, the court held ineligible patent claims directed to a webpage (a type of GUI)

30

that displayed information "indicative of an electronic auction," such as "bid amounts" and "ending time." No. 13CV1612, 2015 WL 1415265, at *1, *6 (S.D. Cal. Mar. 27, 2015). Although the claims recited additional details, the court reasoned that auctions, and information associated with them, are "a fundamental economic practice long prevalent in our system of commerce." *Id.* at *4 (citation omitted); *see also Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, No. 13-03587, 2015 WL 5829783, at *1 (N.D. Cal. Oct. 6, 2015) (claims reciting "a search interface or browser" (a type of GUI) ineligible); *Telebuyer, LLC v. Amazon.com, Inc.*, No. 2:13-cv-1677, 2015 WL 4493045, at *9 (W.D. Wash. July 23, 2015) (claims reciting an e-commerce interface (a type of GUI) ineligible even where the GUI purportedly provided more intuitive and efficient ways of presenting information to a buyer).

### 5.    Claims Directed to an Abstract Idea Remain Abstract Even Without Total Preemption.

The district court further erred in declining to find an abstract idea at *Alice* step one because the challenged claims "do not preempt every way of placing an order for a commodity on an electronic exchange[.]" Appx7. The court reasoned that systems for placing orders on an electronic exchange "existed before this invention, and systems exist now that allow traders to buy and sell commodities on electronic exchanges without infringing the claims of the patents in suit." Appx7.

*First*, preemption is not properly a part of the *Alice* step one analysis, because "questions on preemption are inherent in and resolved by the § 101 analysis." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Instead, addressing the "pre-emption concern that undergirds" § 101 jurisprudence is part of the *Alice* step two analysis. *Alice*, 134 S. Ct. at 2357-58. *Second*, even if it were, this purported lack of total preemption does not establish that the claims are patent-eligible. "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa*, 788 F.3d at 1379; *see also Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, No. 2015-1411, 2015 WL 9461707, at *3 (Fed. Cir. Dec. 28 2015) ("[W]hile assessing the preemptive effect of a claim helps to inform the *Mayo/Alice* two-step analysis, the mere existence of a non-preempted use of an abstract idea does not prove that a claim is drawn to patent-eligible subject matter."). If a lack of total preemption was sufficient to establish patent-eligibility, "all a patentee would need do to insulate itself from a § 101 challenge would be to identify a single prior art reference in the specification and state that its invention improves upon that reference." *Vehicle Intelligence*, 2015 WL 9461707, at *3. Such a loophole in the § 101 analysis would be untenable.

32

**B.    *Alice* Step Two: The Claim Elements, Individually And As An Ordered Combination, Add Nothing Inventive.**

Because the claims are directed to an abstract idea, *Alice* step two requires the Court to determine whether the claims contain an "inventive concept" sufficient to "transform" them into claims that are patent-eligible.   134 S. Ct. at 2357.   The challenged claim elements, both individually and as an ordered combination, do not recite an inventive concept.   The use of generic computer technology to perform routine tasks associated with commodities trading, such as displaying and updating market information, and placing an order based on that market information, cannot transform the claimed abstract idea into a patent-eligible invention.   *See id.* at 2354, 2359 (using generic computers to perform "basic functions," such as obtaining data, are "well-understood, routine, conventional activities previously known to the industry," and do not add "something more" to transform an abstract idea into a patent-eligible invention).   Accordingly, the district court's holding that the claims include an inventive concept, one necessarily rooted in computer technology, is legally erroneous.

**1.    The "Static Price Index" Does Not Transform The Abstract Commodity-Trading Idea Into A Patent-Eligible Invention.**

The district court held, as a matter of law, that the "static price index" element of the challenged claims was an "inventive concept."   Appx8-9, Appx207 at claim 1 (claiming a "static display of prices"), Appx223-24 at claim 1 (claiming

a "static price axis"). This supposed inventive concept is nothing more than organizing and displaying market information in a conventional and well-known tabular format. The design choice to display some market information statically and other information dynamically does not add an "inventive concept" that would "transform" the abstract idea of the challenged claims—GUIs displaying both static and dynamic information were "well-understood, routine, conventional activity." *See Mayo*, 132 S. Ct. at 1298. Nor do the challenged claims identify any new hardware or software for creating a static display of prices. The "static price index" is, thus, not inventive and does not transform the claimed abstract idea into a patent-eligible invention.[2]    *See Alice*, 134 S. Ct. at 2357 ("appending conventional steps … [is] not 'enough' to supply an 'inventive concept.'")

---

[2]    The PTAB reached the same conclusion in instituting § 101 CBMR trials of the patents-in-suit. Regarding the '304 patent, the PTAB found that "use of a common static price index … on a trading GUI" was known" and "does not transform the abstract idea into a patent-eligible invention." Appx3172 (citing *CyberSource*, 654 F.3d at 1370). Regarding the '132 patent, the PTAB found that "[a]ny contention Patent Owner may have that making the display of prices static is an inventive concept is unpersuasive." Appx3127. Choosing a static display over a dynamic display does not "involve[] an inventive concept, particularly where the '132 patent concedes that there is nothing inventive regarding the programming associated with displaying the price, bid, and ask data." *Id.* (citing Appx203-204 at 4:62-5:1). Again, this Court may take judicial notice of these decisions. *VirtualAgility*, 759 F.3d at 1312-13; Fed. R. Evid. 201(b). In the institution decision that was before the district court, the PTAB also found the claims lacked an inventive concept. Appx753 ("claim 1 [of the '132 patent] does no more than simply instruct the practitioner to implement the abstract idea on a GUI," which does not transform the abstract idea into patent-eligible subject matter); Appx1585-87 (discussing institution decision at § 101 hearing).

34

(quoting *Mayo*, 132 S. Ct. at 1300, 1297, 1294); *Digitech*, 758 F.3d at 1351 (method claims reciting steps of gathering and combining data that are not tied to a particular processor do not satisfy *Alice* step two).

The "static price index" presents a static display of prices, which are aligned with a dynamic display of market depth of a commodity—the aggregate of bid and ask prices and quantities, Appx203 at 4:56-58, Appx219 at 4:60-62—in a grid format. TT illustrated this alignment with an annotated version of Figure 3:



Appx691, Appx2427, Appx1600-01 (discussing slide 42, Appx2427).

There can be no dispute that the display of commodities market information in a grid was "well-understood, routine, conventional activity." *See Mayo*, 132 S.

35

Ct. at 1298. The common specifications acknowledge that the claimed steps of displaying bids and asks relative to a price was well-known. *See* Appx202 at 1:59-60, Appx218 at 1:65-66 (prior art GUIs "enable[d] traders to … obtain market quotes, and monitor positions"). As far back as the 1980s, electronic displays of market information were presented in a grid. Appx2787 at ll. 4-10 (TT's expert Christopher Thomas testifying PTX 5518 shows systems available to traders, including "one called INTEX, and that's from the 1980s"), Appx3063 (PTX 5518 showing Intex screen with market information in grid), Appx2753 at ll. 17-18, *see also* Appx2403, Appx1590-91 (discussing slide 18, Appx2403). Another TT expert, Dr. Craig Pirrong, admitted at trial that prior art GUIs that showed market depth and the inside market in a table or grid ("the market grid screen"), as shown in his trial exhibit PTX 5227, were "conventional":



Appx3051, Appx2586 at ll. 17-21 (testifying that the screens on both sides of slide

27, PTX 5227 and Appx3051, are "conventional"), Appx2583 at ll. 17-25

(testifying that a trader uses "these conventional screens, the market grid screen"),

Appx2541 at ll. 16-17, Appx939 (TT describing screens like those in PTX 5227,

Appx3051, as "[p]rior art GUIs"), Appx2402-03, Appx1590-91 (discussing the

prior art GUIs on slides 17-18, Appx2402-03).

Claims that merely organize market information into a grid, such as the one

illustrated in Figure 3 of the patents-in-suit, without otherwise reciting anything

more than conventional elements lack an "inventive concept." *See Digitech*, 758

F.3d at 1350-51 (no inventive concept in process for "organizing information

through mathematical correlations" and "manipulat[ing] existing information to generate additional information" that is not tied to any specific processor); *CyberSource*, 654 F.3d at 1370, 1375 ("mere collection and organization of data" not patent-eligible); *Shortridge v. Found. Constr. Payroll Serv., LLC*, No. 14-CV-04850, 2015 WL 1739256, at *12 (N.D. Cal. Apr. 14, 2015) (claims' use of relational databases and tables to organize data not inventive because it is "well-understood, routine, conventional and previously known to the industry" (quoting *Alice*, 134 S. Ct. at 2359)); *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-CV-00570, 2015 WL 1133244, at *9 (N.D. Cal. Mar. 10, 2015) (finding "no inventive concept in combining computer readable media with the idea of categorizing and organizing information hierarchically"); *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1176 (C.D. Cal. 2014) ("conventional elements" tacked onto claims directed to abstract idea of "organizing information using tabular formats" do not supply an inventive concept).

The district court found, nonetheless, that the "static price index" was an "inventive concept" because it "allowed some traders the ability to more efficiently and accurately place trades on electronic trading systems." Appx8. Although keeping the display of all prices static *may* be novel over the prior art, in which the static display was of the prices comprising the inside market, the alleged novelty of the claims is irrelevant to the § 101 analysis. *See Parker*, 437 U.S. at 588 (§ 101

"does not involve the familiar issues of novelty and obviousness"); *Diamond*, 450 U.S. at 190 (novelty is "wholly apart from whether the invention falls into a category of statutory subject matter") (citation omitted); *Ultramercial*, 772 F.3d at 714-15 ("addition of merely novel or non-routine components to the claimed idea" does not turn "abstraction into something concrete"); *IpLearn,* 76 F. Supp. 3d at 534 (non-anticipated and non-obvious idea does not make abstract idea patent eligible). As relevant here, however, the "static price index" is nothing more than keeping one portion of the display static. As TT admitted, the prior art also kept one portion of the display static. Appx939 ("best bid price and best ask price are displayed at fixed locations on the screen"). The only difference is that the prior art kept the location of the display of the best bid price and best ask price (the inside market) static, while the challenged claims keep the display location of all prices at which the commodity might be traded static. *Compare* Appx939 *with* Appx207 at claim 1, Appx223-24 at claim 1.

To transform an abstract idea into patent-eligible subject matter "requires 'more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). The claims must include "additional features" that "must be more than 'well-understood, routine, conventional activity'" to transform an abstract idea into patent-eligible claims. *Ultramercial*, 772 F.3d at 715 (quoting *Mayo*, 132 S. Ct. at 1298). Where claims

39

state an abstract idea but "contain[] no restriction on how the result is accomplished," they do not include an inventive concept. *Internet Patents*, 790 F.3d at 1348; *see also Dealertrack*, 674 F.3d at 1333 (claim is not rendered patent-eligible by addition of computer when patent does not identify how computer is "specially programmed" to perform claim steps).

The "static price index" is no more than an abstract idea, which the patents say to apply to a GUI. *See* Appx207 at claim 1, Appx223-24 at claim 1. The challenged claims do not place any restriction on how to create a static price index, and the common specifications state that the "present invention" maps the market information to the screen display "through simple algorithms and mapping tables" and uses "***any*** technique known to those skilled in the art" to map the information. Appx203-204 at 4:61-5:3, Appx219-220 at 4:66-5:7 (emphasis added). A computer does not need to be "specially programmed" to create the "static price index," as "[t]he present invention is not limited by the method used to map the data to the screen display." *Id.* The common specifications even describe the claimed display as the "logical" way to display data. Appx205 at 7:17-34, Appx221 at 7:37-54.

Whether it may require a degree of sophistication to display dynamic bids and asks against a static price index is irrelevant to *Alice* step two. *First*, "the complexity of the implementing software or the level of detail in the specification

does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345 (claims that "do not provide sufficient additional features or limit the abstract concept in a meaningful way" do not transform the abstract idea). *Second*, the challenged claims do not require any specific way of dynamically displaying bids and asks relative to a static price, but rather permit the use of any known technique to create the "static price index." Appx203-204 at 4:61-5:3, Appx219-220 at 4:66-5:7 ("The present invention processes [information] and maps it through simple algorithms and mapping tables …. The physical mapping of such information to a screen grid can be done by any technique known to those skilled in the art. The present invention is not limited by the method used to map the data to the screen display.").

Displaying market information in a grid was conventional and logical. *See, e.g.,* Appx2586 at ll. 17-21, Appx205 at 7:17-34, Appx221 at 7:37-54, Appx939. Choosing to display information statically is also a basic and well-known design choice. Appx3127 (choosing a static display over a dynamic display does not "involve[] an inventive concept"). It follows that the "static price index" is not an inventive concept that renders the challenged claims patent-eligible. *See Alice*, 134 S. Ct. at 2359-60; *Internet Patents*, 790 F.3d at 1348; *Digitech*, 758 F.3d at 1350-51 (process for "organizing information through mathematical correlation" and "manipulat[ing] existing information to generate additional information" that is not

41

tied to any specific processor does not provide an inventive concept); *Dealertrack*, 674 F.3d at 1333; *Enfish*, 56 F. Supp. 3d at 1176-77 (claims that recite only "conventional elements" do not supply an inventive concept to an abstract idea). The district court's holding to the contrary was erroneous as a matter of law.

> ### 2.    The Other Claim Elements, Individually, Do Not Transform The Abstract Commodity-Trading Idea Into A Patent-Eligible Invention.

The district court did not identify any other element(s) of the challenged claims as adding "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *See Alice*, 134 S. Ct. at 2357. A review of those elements demonstrates that they do not. They involve steps required in commodities trading using "purely functional and generic" computer components performing "generic computer functions." *Alice*, 134 S. Ct. at 2359-60. In a petition for a writ of mandamus to this Court, TT admitted that the claimed invention is "a combination of features that make up the improved GUI, not the equipment on which it runs," which is "conventional computing equipment." Appx3393, Appx3399.

The representative claims recite methods using a "user input device" and a GUI for displaying market information. Appx207 at claim 1, Appx223-24 at claim 1. The claims do not describe how the GUI is to be displayed, or provide any details regarding the "user input device." Appx207 at claim 1, Appx223-24 at

claim 1. The common specifications state that "the present invention can be implemented on any existing or future terminal or device" and explains the "user input device" could be a computer mouse "or other input device." Appx203 at 4:4-19, Appx219 at 4:8-23. These components add nothing to the abstract claims because they are generic and perform "basic functions." *Alice*, 134 S. Ct. at 2354, 2359.

The representative claims further require a trader using the claimed GUI to "set[]" trading parameters and "send[]" the collected parameters to an electronic commodities exchange to complete an order. Appx207 at claim 1, Appx223-24 at claim 1. As the common specifications state, setting parameters of price and/or quantity and sending the parameters to the exchange are necessary parts of any electronic trade because "every exchange requires that certain information be included in each order." Appx202 at 2:16-22, Appx218 at 2:21-27. Prior art GUIs collected and used the same type of information from the trader as the GUI of the challenged claims because "each market supplies and requires the same information to and from every trader" and "everyone logged on to trade can receive this information if the exchange provides it." Appx202 at 2:11-22, Appx218 at 2:16-27. "'Simply appending conventional steps, specified at a high level of generality,' [is] not 'enough' to supply an 'inventive concept.'" *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1300, 1297, 1294); *see also*

43

*CyberSource*, 654 F.3d at 1372 ("data-gathering" insufficient to transform claim). Because the elements of the challenged claims add nothing new or inventive, the claims are not transformed into a patent-eligible invention.

> **3.    The Claim Elements, Viewed As An Ordered Combination, Do Not Transform The Abstract Commodity-Trading Idea Into A Patent-Eligible Invention.**

The district court did not address whether the challenged claims are patent-eligible when viewed as an ordered combination, other than to make a passing reference to the concept.    Appx9.    The claim elements, viewed as an ordered combination, do not recite anything more than the abstract idea of displaying and updating market information for a commodities exchange, and placing an order based on that market information.

The Supreme Court has held that claims that do not "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" do not transform claims directed to an abstract idea into a patent-eligible invention.  *Alice*, 134 S. Ct. at 2359-60.  The claims here do not improve the functioning of a computer because the invention can be implemented "on any existing or future terminal or device" with a display and a mouse.    Appx203 at 4:4-15, Appx219 at 4:8-19.    TT has admitted as much. Appx3391, Appx3393.  Even when the claim elements are viewed "as an ordered combination," the generic computer components recited in the challenged claims

—the GUI and user input device—"ad[d] nothing … not already present when the steps are considered separately."  *See Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1298).

The claimed GUI receives market data from multiple exchanges and displays it, "translat[ing]" the data into "a simple preferred data format."  Appx207 at claim 1, Appx203 at 4:28-35, Appx223-24 at claim 1, Appx219 at 4:32-39.  But this is exactly the sort of "organizing information through mathematical correlation" that this Court has held to be patent-ineligible.  *Digitech*, 758 F.3d at 1350-51.  The ordered combination of claim elements just recites details of how to organize the market information.  The claims here, like those in *Alice*, "amount to 'nothing significantly more' than an instruction to apply the abstract idea … using some unspecified, generic computer."  *Alice*, 134 S. Ct. at 2360 (quoting *Mayo*, 132 S. Ct. at 1298).

The organization of market data recited by the ordered combination of claim elements merely uses a computer to automate what "can be performed in the human mind, or by a human using a pen and paper."  *CyberSource*, 654 F.3d at 1372-73; *see also Capital One*, 792 F.3d at 1368 (finding claims to user-selected pre-set spending limits and alerts do not include an inventive concept because "the budgeting calculations at issue … 'could still be made using a pencil and paper'") (citation omitted).  Performing the ordered combination of steps recited by the

claims may be slow, but using a computer to speed up such basic and routine functions does not confer patent-eligibility. *Capital One*, 792 F.3d at 1370 ("[M]erely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible.").

### 4.    *DDR Holdings*, On Which The District Court Heavily Relied, Does Not Save The Claims.

The district court relied heavily, but mistakenly, on this Court's decision in *DDR Holdings* to find that the challenged claims are patent-eligible. The district court's conclusion is based on its incorrect finding that the challenged claims are "'rooted in computer technology in order to overcome a problem specifically arising in the realm of' computers," in the manner of the claimed invention in *DDR Holdings*. Appx9 (quoting *DDR Holdings*, 773 F.3d at 1257). But unlike the claims in *DDR Holdings*, the challenged claims here are ***not*** rooted in computer technology, and they are far more abstract and contribute no inventive concept to that abstract idea, rendering *DDR Holdings* inapposite. *See Capital One*, 792 F.3d at 1371.

As an initial matter, the claims-at-issue in *DDR Holdings* did not recite "a fundamental economic or longstanding commercial practice," and "the precise

nature of the abstract idea [was] not as straightforward as in *Alice* or … other recent abstract idea cases"—as in this case. 773 F.3d at 1257. Instead, the claims in *DDR Holdings* were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* Internet users visiting one website might be interested in viewing products sold on another site. *Id.* at 1257–59. The "routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" would entirely redirect users away to the other website, a result the first website's owner does not want. *Id.* The claims recited a "specific" and "inventive" way that "interactions with the Internet are manipulated to yield [the] desired result." *Id.* Rather than sending the first host website's visitors to a third-party website, on the click of a hyperlink the claimed solution constructed, and directed users to, a hybrid web page incorporating "look and feel" elements from the host website with commerce objects from the third-party website. *Id.* The claimed solution uniquely had no pre-Internet analogue—preventing website visitors from being "near-instantaneous[ly] transport[ed]" to another website is a phenomenon unknown in the brick and mortar context. *Id.* at 1258. This Court explained that the claims in *DDR Holdings* "stand apart [from other computer-based claims found patent-ineligible] because they do not merely recite the performance of some business

practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257.

Unlike the claims in *DDR Holdings*, the challenged claims *do* have a pre-Internet and pre-computer analogue: pre-existing, non-electronic commodities trading. This Court repeatedly has found computer-based claims patent-ineligible when they have such pre-existing analogues. *See, e.g., Capital One*, 792 F.3d at 1369 (likening claims for customizing and displaying web pages to tailoring inserts in newspapers); *Content Extraction*, 776 F.3d at 1347 (likening claims for organizing and storing digital data from documents to a banker reading information off of checks). In *Vehicle Intelligence*, this Court distinguished *DDR Holdings* because the claims-at-issue were "not necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks as in *DDR Holdings*," but rather were "broadly drafted to cover testing a vehicle operator for impairments, similar to a police officer field-testing a driver for sobriety"—a practice obviously pre-dating computers and the Internet. 2015 WL 9461707, at *5 (internal quotes omitted).

Multiple district courts also have distinguished *DDR Holdings* because the claims have a pre-Internet or pre-computer analogue. *See, e.g.*, *Garfum.com Corp. v. Reflections By Ruth d/b/a Bytephoto.com*, No. 14-5919, 2016 WL 1242762, at *4-6 (D.N.J. Mar. 30, 2016) (finding claims directed to ranking content by

48

popularity and within a category as "exactly of the type distinguished by the court in *DDR Holdings* … [they] merely recite the performance of some business practice known from the pre-Internet world … on the Internet."); *Source Search Techs., LLC v. Kayak Software Corp.*, 111 F. Supp. 3d 603, 613 (D.N.J. July 1, 2015) (finding claims directed to obtaining price quotes from multiple vendors patent-ineligible as "not solv[ing] a computer-centric problem like the hyperlink issue in *DDR Holdings*"); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-1747, 2015 WL 436160, at *5 (D. Del. Jan. 27, 2015) (finding claims directed to generating price quotes for financial products patent-ineligible because the claims "do[] precisely what *DDR Holdings* explains is fatal … : 'recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.'") (quoting *DDR Holdings*, 773 F.3d at 1257); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 395 (D. Del. 2015) (finding claims patent-ineligible because they "are not 'necessarily rooted' in computer networks" but "may be performed by humans, with the exception of generic computer-implemented steps that cannot serve as an inventive concept.").

The challenged claims are also unlike the claims in *DDR Holdings* because they do *not* address problems unique to computers, the Internet, or the web. Despite its holding to the contrary, the district court's analysis shows why that is

so.   According to the district court, the problem that the challenged claims allegedly solved was not a problem with using a computer, the Internet, or the web as such, but rather with the trader's ability to place a commodities order based upon displayed market information.   Appx6.   That is an abstract idea.   Improving the performance of that abstract idea by implementing it on a computer is not addressing an inherent problem with the computer, the Internet, or the web, but rather addresses a problem only with the abstract idea.   *See Versata*, 793 F.3d at 1335 (finding claims did not include an inventive concept where they "are directed to price determination and merely use a computer to improve the performance of that determination—not the performance of a computer."); *buySAFE*, 765 F.3d at 1354 ("generic computer implementation" did not supply inventive concept).   In *Versata*, this Court distinguished *DDR Holdings*, noting the claims were "not rooted in computer technology to solve a problem specifically arising in some aspect of computer technology," but were "more like the claims [this Court] summarized in *DDR Holdings* as insufficient to reach eligibility," reciting long-extant and commonplace "business method[s] aimed at processing business information."   *Versata*, 793 F.3d at 1334.

Unlike the claims in *DDR Holdings*, which overcame a problem with the Internet hyperlink protocol, the claimed GUI simply re-arranges market data on a computer screen using what TT describes as "simple algorithms," and using "any

50

technique." Appx203-04 at 4:61-5:3, Appx219-20 at 4:66-5:7. The representative claims do not say anything regarding a particular kind of a computer or programming, instead reciting that the method uses a GUI and a "user input device." Appx207 at claim 1, Appx223-24 at claim 1. The common specifications explain that the claims only require a generic "computer or [an] electronic terminal," and that the claimed GUI can be implemented "on any existing or future terminal or device" and "is not limited by the type of terminal or device used." Appx203 at 3:64-4:9, Appx219 at 4:1-13. The "user input" device could be a computer mouse "or other input device." Appx203 at 4:4-19, Appx219 at 4:8-23.

At bottom, *DDR Holdings* is inapplicable because the challenged claims are directed to "a fundamental economic or longstanding commercial practice," have a well-known pre-web, pre-Internet and pre-computer analogue, and do not address problems unique to computers, the Internet, or the web.

### C.    The Challenged Claims Also Fail The Machine-or-Transformation Test, Confirming They Are Not Patent-Eligible.

The Supreme Court has endorsed this Court's machine-or-transformation test as a "useful and important clue" in analyzing patent-ineligibility. *Bilski*, 561 U.S. at 593-94, 604. Although the test is not dispositive, failure to meet it likely means that the claims are patent-ineligible. *Bilski*, 561 U.S. at 604-05; *Ultramercial*, 772 F.3d at 716-17. The district court did not address CQG's

arguments that the challenged claims fail the machine-or-transformation test, *see generally* Appx1-9, Appx634, but they fail that test too.

To satisfy the machine-or-transformation test, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope." *In re Bilski*, 545 F.3d 943, 961 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010); *see also CyberSource*, 654 F.3d at 1375. The "incidental use of a computer to perform [a] mental process" or "merely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer" is not enough to satisfy the machine prong. *CyberSource*, 654 F.3d at 1375. Simply manipulating "public or private legal obligations or relationships, business risks, or other such abstractions" similarly cannot meet the test's transformation prong because "they are not physical objects or substances, and they are not representative of physical objects or substances." *Ultramercial*, 772 F.3d at 717 (citation omitted).

Applied here, the challenged claims fail the machine prong of the test. Nothing in the representative claims ties the GUI to a particular machine. *See* Appx207 at claim 1, Appx223-24 at claim 1. The common specifications explain that the claims only require a generic "computer or [an] electronic terminal" that is "able to communicate either directly or indirectly" with the exchange. Appx203 at 3:64-4:15, Appx219 at 4:1-19. The claimed GUI can be implemented "on any

existing or future terminal or device" and "is not limited by the type of terminal or device used." Appx203 at 3:64-4:9, Appx219 at 4:1-13. TT itself asserted that "the claimed tool is implemented graphically [on a computer] merely because of the state of technology today—it would be possible to implement a comparable tool *mechanically*." Appx694, Appx700 (emphasis added). A claim predicated on a generic computer, which can be implemented mechanically, *ipso facto* cannot be "tied to a particular machine or apparatus." *In re Bilski*, 545 F.3d at 954; *see also CyberSource*, 654 F.3d at 1370 (claims fail machine prong when not required "to be performed by a particular machine, or even a machine at all").

The challenged claims also fail the transformation prong. The representative claims require the collection and organization of commodities market data on a GUI. *See* Appx207 at claim 1, Appx223-24 at claim 1. As stated in *CyberSource*, the "[t]he mere collection and organization of data … is insufficient to meet the transformation prong of the test." 654 F.3d at 1370, 1375; *see also Cyberfone*, 558 F. App'x at 993. The commodities trades that the claimed GUI purportedly facilitate represent nothing more than "private legal obligations or relationships," which fails to satisfy the transformation prong of the test. *Ultramercial*, 772 F.3d at 717 (citation omitted). Offers to buy (bids), offers to sell (asks), or obligations to transact commodities (executed orders) are not "physical objects or substances,

and … are not representative of physical objects or substances," so manipulating them as the claimed GUI does cannot meet the transformation prong. *Id.*

## II. THE DISTRICT COURT ERRED IN IMPOSING A CLEAR AND CONVINCING BURDEN OF PROOF ON CQG'S § 101 CHALLENGE.

The district court acknowledged that "[t]here is some dispute over the level of proof required in a section 101 patent-eligibility inquiry" and recognized "the persuasiveness" of Justice Breyer's reasoning "that because the section 101 eligibility inquiry is purely a question of law and there is no statutory presumption of eligibility, it should not be subject to the clear and convincing burden of proof." Appx3 (citing *Microsoft*, 131 S. Ct. at 2253 (Breyer, J., concurring)). Yet the district court held that "CQG must show by clear and convincing evidence that the patents-in-suit claim patent-ineligible subject matter." Appx4. This was legal error.

It is well settled that the issue of patent-eligibility under § 101 is a question of law. *OIP Techs.*, 788 F.3d at 1362; *Accenture*, 728 F.3d at 1340–41. Evidentiary burdens of proof, such as "clear and convincing" evidence, are applied "to questions of fact and not to questions of law." *Microsoft,* 131 S. Ct. at 2253 (Breyer, J., concurring); *see also, e.g.*, *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007) ("Because a patent is presumed to be valid, the ***evidentiary burden*** to show ***facts*** supporting a conclusion of invalidity is one of clear and

convincing evidence." (emphasis added)).   The evidentiary burden of a "clear and convincing" showing does not properly apply to a question of law, such as patent-eligibility under § 101.  *See Anhydrides & Chemicals, Inc. v. U.S.*, 130 F.3d 1481, 1486 (Fed. Cir. 1997) ("Evidentiary presumptions set the burdens of proof and production, but they do not affect the determination of issues of law."); *cf. O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) ("The case before us does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard … to a record that the presentation of evidence is no longer likely to affect.").

Although a "clear and convincing" evidentiary burden is not properly applied to the ultimate legal question of patent-eligibility, it may be the proper evidentiary burden to apply to any factual disputes underlying the legal question. *See Microsoft*, 131 S. Ct. at 2253 ("Courts can help to keep the application of [the] 'clear and convincing' standard within its proper legal bounds by separating factual and legal aspects of an invalidity claim.") (Breyer, J., concurring); *cf. Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015) (distinguishing between ultimate legal issue of patent claim construction subject to de novo review and subsidiary factual questions subject to clear error review).   Numerous district courts have reached that conclusion, distinguishing subsidiary factual questions—to which an

evidentiary burden such as "clear and convincing" might apply—from the ultimate legal question of § 101 patent-eligibility.[3]

Here, however, the outcome of the § 101 challenge rests "not upon factual disputes, but upon how the law applies to facts as given." *Microsoft*, 131 S. Ct. at 2253 (Breyer, J., concurring); *see also Content Extraction*, 776 F.3d at 1344 (affirming 12(b)(6) dismissal under § 101); *Ultramercial*, 772 F.3d at 711–12 (same); *Internet Patents Corp. v. Gen. Auto. Ins. Servs., Inc.*, 29 F. Supp. 3d 1264, 1266 (N.D. Cal. 2013) (resolving § 101 on 12(b)(6) motion to dismiss), *aff'd,* 790 F.3d 1343 (Fed. Cir. 2015). Both prongs of the *Alice* test are legal questions: whether the challenged claims are directed to an abstract idea and, if so, do they

---

[3] *See, e.g.*, *TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, No. 11 CIV. 4039, 2016 WL 817447, at *10 (S.D.N.Y. Feb. 22, 2016) ("Because no evidence outside the pleadings is considered in deciding a motion to dismiss or a motion for judgment on the pleadings, 'it makes little sense to apply a clear and convincing evidence standard — a burden of proof — to such motions.'") (citation omitted); *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, No. 3:12-cv-01065, 2015 WL 4203469, at *4–5 (D. Or. July 9, 2015); *Kickstarter, Inc. v. Fan Funded, LLC*, No. 11 Civ. 6909, 2015 WL 3947178, at *5 n.7 (S.D.N.Y. June 29, 2015) ("While it is true that, to the extent the Court as factfinder must make *factual* determinations, the 'clear and convincing' standard applies … , to the extent that the Court is drawing legal conclusions (e.g., whether the subject matter is patent-eligible under Section 101), no such standard applies. In arguing [for] a 'clear and convincing' standard to determine subject matter eligibility, Defendants conflate an evidentiary burden with legal analysis."); *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, No. 6:15-CV-0029, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015) ("Although the issue of invalidity under § 101 presents a question of law, the Court recognizes that a legal conclusion 'may contain underlying factual issues.' To the extent that questions of fact exist, the Court will apply the clear and convincing evidence standard." (internal cites omitted)).

claim an inventive concept. *See Alice*, 134 S. Ct. at 2355; *OIP Techs.*, 788 F.3d at 1362. Here, answering those legal questions does not turn on any factual disputes. Whatever burden of proof should apply to facts underlying the § 101 inquiry, it has no bearing on the answer to those two legal questions in this case.

Nonetheless, the district court held that "CQG has not met its burden of proving by clear and convincing evidence that the patents in suit are directed to an 'abstract idea.'" Appx7. In essence, the district court required CQG to convince it that CQG's *legal* position was *clearly* correct—based on something more than the mere correctness of that position under the applicable law. That is not how courts decide questions of law, and the district court cited nothing to support its novel approach.[4]

Having held CQG to an improper standard in resolving a legal question, the district court's decision cannot be sustained.

## CONCLUSION

The district court's judgment should be vacated and judgment entered in favor of CQG because the challenged claims recite patent-ineligible subject matter under 35 U.S.C. § 101.

---

[4] Even if the court were to apply the district court's approach to the legal questions presented, the judgment should still be reversed for the reasons explained in Section I.

Dated: April 25, 2016                    Respectfully submitted,

                                         */s/  Kenneth R. Adamo*
Adam G. Kelly                            Kenneth R. Adamo
William J. Voller III                    Eugene Goryunov
John A. Cotiguala                        Meredith Zinanni
LOEB & LOEB LLP                          Vishesh Narayen
321 North Clark Street                   KIRKLAND & ELLIS LLP
Suite 2300                               300 North LaSalle
Chicago, IL 60654                        Chicago, IL  60654
(312) 464-3100                           (312) 862-2000

                                         John C. O'Quinn
                                         KIRKLAND & ELLIS LLP
                                         655 15th Street, NW
                                         Washington, DC 20005
                                         (202) 879-5000

                                         *Counsel for Appellants*

# ADDENDUM

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-cv-4811 |
| CQG, INC., and CQGT, LLC, | ) ) | |
| Defendants. | ) ) | Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

CQG, Inc. and CQGT, LLC (collectively "CQG"), moves for judgment as a matter of law [897] arguing that the patents-in-suit, U.S. patent 6,772,132 ("the '132 patent") and U.S. patent 6,766,304 ("the '304 patent"), are patent-ineligible under 35 U.S.C. § 101. For the reasons stated below, this Court denies the motion.

**Background**

The following facts are not materially in dispute. TT is the assignee of both the '132 patent and the '304 patent. The '132 patent issued in August 2004 and the '304 patent issued in July 2004. Both patents claim priority to a provisional application filed on March 2, 2000. Both patents also share the same specification, and are directed to "[c]lick based trading with intuitive grid display of market depth." '132 patent, 1:2-3. According to the shared detailed description, the invention described "provides a display and trading method to ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the price fluctuates." *Id.* at 3:54-58. Because the analysis of claims under 35 U.S.C. § 101 is the same regardless of claim type, i.e. method claim, system claim, computer

readable medium claim, etc., this Court may analyze one representative claim from each of the

asserted patents. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359-60 (2014).

Representative claim 1 of the '132 patent recites:

1. A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface and a user input device, said method comprising:
> setting a preset parameter for the trade order
> displaying market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including at least a portion of the bid and ask quantities of the commodity, the dynamic display being aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;
> displaying an order entry region aligned with the static display prices comprising a plurality of areas for receiving commands from the user input devices to send trade orders, each area corresponding to a price of the static display of prices; and
> selecting a particular area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

Representative claim 1 of the '304 patent recites:

1. A method for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the method comprising:
> dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;
> dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the common static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;
> displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis;
> displaying an order entry region comprising a plurality of locations for receiving commands to send trade orders, each location corresponding to a price level along the common static price axis; and

2

in response to a selection of a particular location of the order entry region by a single action of a user input device, setting a plurality of parameters for a trade order relating to the commodity and sending the trade order to the electronic exchange.

On December 4, 2014, the Patent Trials and Appeals Board ("PTAB") instituted a Covered Business Method Review ("CBMR") proceeding of the '132 patent, finding that it was more likely than not that all claims of the '132 patent recited patent-ineligible subject matter. However, the same day, the PTAB declined to institute a CBMR of the '304 patent. As a result, CQG filed a motion with this Court requesting a stay in light of the CBMR proceeding for the '132 patent.[1] This Court denied the motion to stay. CQG appealed that decision to the Federal Circuit Court of Appeals which, on February 5, 2015, affirmed this Court's order. This Court allowed briefing on the eligibility issue under section 101 and heard oral arguments on February 23, 2015.

**Legal Standard**

At the outset, this Court acknowledges that the section 101 jurisprudence is a recently evolving and unsettled area of law as it applies particularly to software patents. There is some dispute over the level of proof required in a section 101 patent-eligibility inquiry. CQG asserts that "[a]s a matter of law, patent-eligibility is not subject to the 'clear and convincing' burden of proof." (Dkt. 898 at 3) (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (Breyer, Scalia, Alito, JJ, concurring)). TT submits that rather than a preponderance of the evidence burden of proof the appropriate standard should be "clear and convincing." (Dkt. 962 at 11) (quoting *Card Verification Solutions, LLC v. Citigroup Inc.*, 2014 WL 4922524, at *5 (N.D. Ill. Sept. 29, 2014)).

This Court recognizes the persuasiveness of Justice Breyer's reasoning that because the section 101 eligibility inquiry is purely a question of law and there is no statutory presumption of eligibility, it should not be subject to the clear and convincing burden of proof. However, 35 U.S.C.

---

[1] The patents were before the PTAB on a petition filed by TD Ameritrade, a party in another lawsuit proceeding in this court. CQG filed its own petition with the USPTO for a covered business method patent review for each of the patents-in-suit on January 9, 2015.

§ 282 provides that patents are presumed valid and it is well established that a party seeking to

overcome that presumption must do so by clear and convincing evidence. *See Nystrom v. Trex Co.,*

424 F.3d 1136, 1149 (Fed. Cir. 2005). This Court is "duty-bound to apply the law as enacted by

Congress and signed by the President, and in light of the Federal Circuit's interpretation thereof.

Defendants have not presented any authority indicating that the presumption of validity no longer

applies to challenges to a patent's validity under section 101." [2] *CertusView Techs., LLC v. S&N*

*Locating Servs., LLC,* 2015 U.S. Dist. LEXIS 7126, *42 n.6, Slip Copy, 2015 WL 269427 (E.D. Va.

Jan. 21, 2015). Accordingly, this Court concludes that, until the Federal Circuit or the United

Supreme Court mandates otherwise, CQG must show by clear and convincing evidence that the

patents-in-suit claim patent-ineligible subject matter.

**Discussion**

Section 101 provides that "Whoever invents or discovers any new and useful process,

machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35

U.S.C.A. § 101.  Supreme Court precedents provide three specific exceptions to section 101's

principles of patentability: "laws of nature, physical phenomena, and abstract ideas." *Diamond v.*

*Chakrabarty,* 447 U.S. 303, 309 (1980). *Alice* articulates a two-step process to determine whether

claims of a patent are within the realm of patent-eligible subject matter. *Alice Corp.,* 134 S. Ct. at 2354

(relying on *Mayo Collaborative Servs. v. Prometheus Labs.,* 132 S. Ct. 1289, 1303, 1294 (2012).

This Court must first determine whether the claims of the asserted patents are directed to a patent-

ineligible concept: laws of nature, physical phenomena, and abstract ideas. *Alice Corp.,* 134 S. Ct. at

2355; *see also Mayo,* 132 S.Ct. at 1296-1297. This Court must then "consider the elements of each

---

[2] CQG points to another concurrence to show that no presumption of eligibility should attach to a § 101 analysis.

*Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 720 (Fed. Cir. Nov. 14, 2014) (Mayer, J, concurring)).

claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1298, 1297). This second step requires a search for an "'inventive concept,' or some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at 2355). Finally, as *Alice* makes clear, the claims "do more than simply instruct the practitioner to implement the abstract idea" on a generic computer either separately or as an ordered combination. *Alice*, 134 S. Ct. at 2359.

*1. Abstract Idea*

This Court must first determine whether the claims at issue are directed to an abstract idea. *DDR Holdings*, 773 F.3d at 1256-1257. CQG argues that the claims of both the '132 patent and the '304 patent "recite the abstract idea of placing an order for a commodity on an electronic exchange, based on observed market information, as well as updating the market information." Dkt. 898 at 1. As a result, CQG maintains, "the abstract idea is nothing more than 'a fundamental economic practice long prevalent in our system of commerce.'" *Id.* (quoting *Alice*, 134 S.Ct. at 2356). TT asserts that the claims of the patents in suit are not directed to an abstract idea, but to an improvement in computer technology. However, TT maintains that assuming *arguendo* that the claims do recite an abstract idea, the claims "do not seek to tie up the alleged abstract idea such that others cannot practice it." Dkt. 962 at 13.

Here, neither the claims in the '132 patent nor the claims in the '304 patent are directed to a mathematical algorithm. *See Gottschalk v. Benson*, 409 U.S. 63, 64 (1972) (holding that mathematical algorithms, even those implemented on a computer, are abstract ideas). The claims similarly do not "recite a fundamental economic or longstanding commercial practice," *DDR Holdings*, 773 F.3d at

1257, as electronic trading has only been viable for a couple of decades, and its analog predecessor, open outcry trading systems, operate in a significantly different fashion. The claims of the patents also do not address a challenge in business. Rather, the claims at issue in both patents profess to solve problems of prior graphical user interface devices (GUIs), in the context of computerized trading, relating to speed, accuracy and usability.

CQG argues that: "[t]he Asserted Claims recite the abstract idea of placing an order for a commodity on an electronic exchange, based on observed market information, as well as updating the market information." Dkt. 898 at 1. CQG further contends that the elements recited in the claims merely perform basic functions relating to electronic commodity trading and updating market information using unidentified and generic computer components. CQG further asserts that, "the functions recited in the Asserted Claims – setting, displaying, and selecting – are all 'purely conventional' and cannot save the claims." *Id.* at 2 (quoting *Alice*, 134 S. Ct. at 2359).

If the claims simply provided for "setting, displaying, and selecting" data or information, CQG would be correct in its assessment that the claims are directed to an abstract idea. However, CQG ignores much of the details of the representative claims. Neither the claims of the '304 patent nor the claims of the '132 patent are directed to solely "setting, displaying, and selecting" data or information that is visible on the GUI device. Rather, the claims are directed to solving a problem that existed with prior art GUIs, namely, that the best bid and best ask prices would change based on updates received from the market. There was a risk with the prior art GUIs that a trader would miss her intended price as a result of prices changing from under her pointer at the time she clicked on the price cell on the GUI. The patents-in-suit provide a system and method whereby traders may place orders at a particular, identified price level, not necessarily the highest bid or the lowest ask price because the invention keeps the prices static in position, and allows the quantities at each price to change.

This issue did not arise in the open outcry systems, i.e. the pre-electronic trading analog of the '304 and '132 patents' claims. In live trading "pits," traders would use verbal communication and hand signals to transfer information about buy and sell orders. In an open outcry system, bids and offers would be made in the open market giving all of the participants a chance to compete for an order with the best price. There is no question that electronic trading is much different than trading in open outcry pits. The speed, quantity and variety of trades that can be made by a single trader over an electronic system are no doubt markedly different than those trades a single trader can make in the open outcry system. This Court concludes, in part, from the apparent differences between the analog versions of trading and electronic trading that the claims of the patents in suit are not directed to the abstract idea of "placing an order for a commodity on an electronic exchange." Dkt. 898 at 1.

The asserted claims similarly do not preempt every way of "placing an order for a commodity on an electronic exchange," as systems for doing so existed before this invention, and systems exist now that allow traders to buy and sell commodities on electronic exchanges without infringing the claims of the patents in suit. Therefore, CQG has not met its burden of proving by clear and convincing evidence that the patents in suit are directed to an "abstract idea."

*2. Inventive Concept*

Even if this Court were to find that the claims of the patents in suit are directed to an abstract idea, the second part of the *Alice* framework, considering the claim elements "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application," leads this Court to one conclusion: the claims recite an inventive concept. *Alice*, 134 S.Ct. at 2355. CQG spent much of its argument, on paper and in court, expounding on the "conventional" nature of trading GUIs. Yet, this argument seems more appropriate for a pre-AIA §§ 102 or 103 validity challenge (for failing to

be novel or nonobvious in light of the prior art). The "inventive concept" step of the *Alice* analysis requires something different than pre-AIA §§ 102 and 103. This step requires courts to locate an element or a combination of elements in the claims "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132, S.Ct. at 1294).

To ensure patents are not granted when the subject matter to which the claims are directed completely preempts an idea, "[a] claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (quoting *Mayo*, 132 S.Ct. at 1297). It is important to note, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention," *Id.* at 2358, thus, the recitation of a GUI in the claims of the patents in suit does not automatically impart patent eligibility.

In searching for the "inventive concept," by analyzing the claim elements both individually and as an ordered combination, this Court need not delve further than identify the clause in the claims which has raised a flurry of commotion throughout these proceedings: the static price index. The '132 patent recites a "dynamic display being aligned **with a static display of prices** corresponding thereto," and the '304 patent recites "each location in the bid display region corresponding to a price level along **a common static price axis**." This element of the representative claims is what adds the "inventive concept" to the patents-in-suit. While not declaring that the "static price axis" is the defining characteristic of the patents which was not known in the prior art before the date of invention (which is only proper under a §§ 102 or 103 analysis), it seems to be the "inventive concept" that allowed some traders the ability to more efficiently and accurately place trades on electronic trading systems.

As such, even if this Court found that the patents were directed to an abstract idea, under the second part of the *Alice* test, this Court finds that at least the "static price axis" element of the patents in suit was an "inventive concept," which eliminated some problems of prior GUIs relating to speed, accuracy and usability, therefore the patents-in-suit claim patent eligible subject matter under the *Alice* framework.  *DDR Holdings*, 773 F.3d at 1259. When the elements of the claims of both the '304 patent and the '132 patent are "taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use" of computers or the Internet. *DDR Holdings*, 773 F.3d at 1259. This Court disagrees with CQG's assessment of *DDR Holdings* as inapposite. Instead, this Court finds that because the claims of both the '132 patent and the '304 patent are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of" computers, like the asserted claims in *DDR Holdings*, the claims here satisfy the requirements of 35 U.S.C. § 101. *See* 773 F.3d at 1257.

**CONCLUSION**

Because the claims are directed to a technological improvement of GUIs, the invention embodied within the claims of both the '132 patent and the '304 patent is not directed to an abstract idea, and even if they were, an element of the claims recite an inventive concept, the claims recite patent eligible subject matter under 35 U.S.C. § 101.

IT IS SO ORDERED.

Date: February 24, 2015

Entered:

SHARON JOHNSON COLEMAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| TRADING TECHNOLOGIES | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff | ) | Judge Sharon Johnson Coleman |
| | ) | |
| v. | ) | Civil Action No. 05 C 4811 |
| | ) | |
| CQG, INC., and CQGT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FINAL JUDGMENT**

A hearing was held in this case on February 23, 2015 regarding patent eligibility and validity under 35 U.S.C. § 101. On February 24, 2015, the Court held as a matter of law that U.S. Patent Nos. 6,772,132 and 6,766,304 are not patent ineligible and not invalid under 35 U.S.C. § 101. (Dkt. 1073.)

A jury trial was held in this case and the jury returned a verdict finding infringement of U.S. Patent Nos. 6,772,132 and 6,766,304 by Defendants and awarded damages to Plaintiff. The Court entered judgment on March 23, 2015. (Dkt. 1211.) The Court has also entered a permanent injunction against Defendants. In view of these rulings and all previous rulings from the Court in this case, pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court hereby enters the following final judgment:

1. Judgment is entered in favor of Plaintiff, Trading Technologies International, Inc., and against Defendants, CQG, Inc. and CQG, LLC f/k/a CQGT, LLC;

2. Plaintiff is awarded damages in the amount of $15,884,106.

**- Appx. 010 -**

3.    Each party shall bear its own attorneys' fees and costs.


**SO ORDERED.**


SIGNED this 17th day of February, 2016.

_____

SHARON JOHNSON COLEMAN
UNITED STATES DISTRICT JUDGE



US006772132B1

(12) **United States Patent**
Kemp, II et al.

(10) Patent No.: **US 6,772,132 B1**
(45) **Date of Patent:** **Aug. 3, 2004**

(54) **CLICK BASED TRADING WITH INTUITIVE GRID DISPLAY OF MARKET DEPTH**

(75) Inventors: **Gary Allan Kemp, II**, Winnetka, IL (US); **Jens-Uwe Schluetter**, Evanston, IL (US); **Harris Brumfield**, Chicago, IL (US)

(73) Assignee: **Trading Technologies International, Inc.**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 245 days.

(21) Appl. No.: **09/590,692**

(22) Filed: **Jun. 9, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/186,322, filed on Mar. 2, 2000.

(51) **Int. Cl.$^7$** ............................................... G06F 17/60

(52) **U.S. Cl.** ............................ 705/37; 705/35; 705/36; 705/37; 705/10; 705/14; 345/814

(58) **Field of Search** .............................. 705/35, 36, 37, 705/10, 14; 345/814

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,674,044 A | 6/1987 | Kalmus et al. ............... 364/408 |
| 4,750,135 A | 6/1988 | Boilen ........................ 364/514 |
| 4,903,201 A | 2/1990 | Wagner |
| 5,038,284 A | 8/1991 | Kramer ...................... 364/408 |
| 5,077,665 A | 12/1991 | Silverman et al. |
| 5,101,353 A | 3/1992 | Lupien et al. |
| 5,136,501 A | 8/1992 | Silverman et al. |
| 5,270,922 A | 12/1993 | Higgins ...................... 364/408 |
| 5,297,031 A | 3/1994 | Gutterman et al. ......... 364/408 |
| 5,297,032 A | 3/1994 | Trojan et al. ............... 364/408 |
| 5,689,651 A | 11/1997 | Lozman ...................... 395/237 |
| 5,774,877 A | 6/1998 | Patterson, Jr. et al. ........ 705/35 |
| 5,793,301 A | 8/1998 | Patterson, Jr. et al. .. 340/825.26 |
| 5,797,002 A | 8/1998 | Patterson, Jr. et al. ...... 395/611 |
| 5,845,266 A | 12/1998 | Lupien et al. ................. 705/37 |
| 5,915,245 A | 6/1999 | Patterson, Jr. et al. ........ 705/35 |
| 5,924,082 A | 7/1999 | Silverman et al. ............ 705/37 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | | WO 99/30259 | * 6/1999 |
| WO | | WO 95/26005 A1 | 9/1995 |
| WO | | WO 98/49639 | 11/1998 |
| WO | | WO 99/19821 | 4/1999 |
| WO | | WO 99/30259 A1 | 6/1999 |
| WO | | WO 99/53424 | 10/1999 |
| WO | | WO 00/52619 | 9/2000 |
| WO | | WO 00/62187 | 10/2000 |
| WO | | WO 00/65510 | 11/2000 |
| WO | | WO 01/16830 | 3/2001 |
| WO | | WO 01/16852 | 3/2001 |
| WO | | WO 01/22315 | 3/2001 |
| WO | | WO 01/88808 | 11/2001 |

OTHER PUBLICATIONS

www.tradingtechnologies.com/products/xtrade__full.html (viewed May 22, 2001), <Jun. 9, 2000.*
Kharouf, A trading room with a view, Fututes, 27,11, Nov. 1998.*
USPTO Presentation, NASDAQ, Nov. 8, 2001, enclosed pp. 1–13.

*Primary Examiner*—Richard Weisberger
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57) **ABSTRACT**

A method and system for reducing the time it takes for a trader to place a trade when electronically trading on an exchange, thus increasing the likelihood that the trader will have orders filled at desirable prices and quantities. The "Mercury" display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently.

**56 Claims, 6 Drawing Sheets**

**US 6,772,132 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,924,083 A | 7/1999 | Silverman et al. | 705/37 |
| 5,946,667 A | 8/1999 | Tull, Jr. et al. | |
| 5,963,923 A | 10/1999 | Garber | 705/37 |
| 6,012,046 A | 1/2000 | Lupien et al. | 705/37 |
| 6,014,643 A | 1/2000 | Minton | 705/37 |
| 6,035,287 A | 3/2000 | Stallaert et al. | |
| 6,098,051 A | 8/2000 | Lupien et al. | 705/37 |
| 6,131,087 A | 10/2000 | Luke et al. | 705/26 |
| 6,134,535 A | 10/2000 | Belzberg | 705/37 |
| 6,195,647 B1 | 2/2001 | Martyn et al. | 705/37 |
| 6,272,474 B1 | 8/2001 | Garcia | 705/37 |
| 6,278,982 B1 | 8/2001 | Korhammer et al. | 705/37 |
| 6,282,521 B1 | 8/2001 | Howorka | 705/37 |
| 6,408,282 B1 | 6/2002 | Buist | |
| 2002/0023038 A1 | 2/2002 | Fritsch et al. | |
| 2002/0055899 A1 | 5/2002 | Williams | |
| 2002/0138401 A1 | 9/2002 | Allen et al. | |

* cited by examiner

FIG. 1

CONNECTION TO MULTIPLE EXCHANGES
101
HOST EXCHANGE
A FACILITIES
HOST EXCHANGE
102
HOST EXCHANGE
B FACILITIES
HOST EXCHANGE B
103
HOST EXCHANGE
C FACILITIES
HOST EXCHANGE
MEMBER FIRM
FACILITIES
104
ROUTER
105
ROUTER
106
ROUTER
107
GATEWAY
108
GATEWAY
109
GATEWAY
TT API
CLIENT
110
CLIENT
111
CLIENT
112
CLIENT
113
CLIENT
114
CLIENT
115
CLIENT
116



## FIG. 2

| | Contract | Depth | BidQty | BidPrc | AskPrc | AskQty | LastPrc | LastQty | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | CDHO | • | 785 | 7626 | 7627 | 21 | 7627 | 489 | 8230 |
| 2 | | | 626 | 7625 | 7629 | 815 | | | |
| 3 | | | 500 | 7624 | 7630 | 600 | | | |
| 4 | | | 500 | 7623 | 7631 | 2456 | | | |
| 5 | | | 200 | 7622 | 7632 | 800 | | | |

201  202  203  204  205

FIG. 3

SYCOM FGBL DEC99
E/W
10:48:44
BidQ
AskQ
Prc
LTQ
L 3
R 5
720
10
0
10 1H
50 3H
1K 5H
S 0 W 24
S 0 W 7
CLR
10
17
CXL
B 0 W 15
B 0 W 13
+ -
NET 0
B 0 W 17
NET REAL
104 99
24 98
33 97
115 96
32 95
27 94
63 93
45 92
28 91
20 90 10
18 89
97 88
30 87
43 86
110 85
23 84
31 83
125 82
21 81
1001 1002 1003 1004 1005 1006
1007 1008 1009 1010 1011 1012 1013 1014 1015 1016 1017 1018 1019 1020 1021

FIG. 4

SYCOM FGBL DEC99
E/W
10:48:44
BidQ
AskQ
Prc
LTQ
L 3
R 5
720
10
0
10 1H
50 3H
1K 5H
CLR
10
17
CXL
+ -
NET 0
NET REAL
S 10
W 14
B 0
W 15
B 0
W 13
B 0
W 17
104 99
24 98
33 97
115 96
32 95
27 94
63 93 10
43 92
125 91
97 90
18 89
97 88
30 87
43 86
110 85
23 84
31 83
125 82
21 81
1101

FIG. 5

SYCOM FGBL DEC99
E/W
10:48:44
BidQ
AskQ
Prc
LTQ
L 3
R 5
720
10
0
10 1H
50 3H
1K 5H
CLR
10
17
CXL
+ -
NET 0
NET REAL
S 0 W 24
S 0 W 7
B 0 W 15
B 0 W 13
B 0 W 17
104 99
24 98
33 97
115 96
32 95
27 94
63 93
45 92
28 91
20 90 10
18 89
97 88
30 87
43 86
110 85
23 84
31 83
125 82
21 81
1206
1205
1204
1208
1201
1202
1203
1207



START
1301
TRADER HAS MARKET DISPLAYED ON HIS COMPUTER SCREEN
1302
SET QUANTITY VALUES IN APPROPRIATE FIELDS (R/L FIELDS, CURRENT QUANTITY FIELD, NetPos, OR OFFSET.)
1303
POSITION CURSOR OVER DESIRED CELL ON THE MERCURY DISPLAY
1304
IS THIS A TRADING CELL - I.E. THE BidQ OR AskQ COLUMN?
NO
1305
NO ORDER SENT (MAY ADJUST QUANTITIES OR OTHER RESTRICTIONS DEPENDING ON CELL SELECTED)
END
YES
1306
IS LEFT OR RIGHT MOUSE BUTTON CLICKED ?
RIGHT
1307
QUANTITY OF ORDER = VALUE IN R FIELD
LEFT
1308
QUANTITY DESCRIPTION CHOSEN?
OFFSET
1309
QUANTITY OF ORDER = VALUE IN L FIELD
THIS WILL ADD UP THE QUANTITIES FOR EACH ORDER IN THE MARKET THAT WOULD FILL THE ORDER BEING ENTERED BY THE TRADER - I.E. THE SUM OF ALL QUANTITIES THAT "BETTER" THE ORDER BEING ENTERED
Plus
1310
ALL QUANTITIES IN THE MARKET FOR PRICES BETTER THAN OR EQUAL TO THE PRICE IN THE ROW CLICKED
NUMBER
1311
QUANTITY OF ORDER= CURRENT QUANTITY
NetPos
1312
QUANTITY OF ORDER= CURRENT NetPos
TRADING WITH MERCURY
1313
COLUMN CLICKED?
BidQ
1315
SEND BUY ORDER TO MARKET FOR PREDEFINED QUANTITY AT THE PRICE OF THE ROW CLICKED
END
AskQ
1314
SEND SELL ORDER TO MARKET FOR DEFINED QUANTITY AT THE PRICE OF THE ROW CLICKED
END

**FIG. 6**

<div style="text-align:center">1</div>

## CLICK BASED TRADING WITH INTUITIVE GRID DISPLAY OF MARKET DEPTH

### PRIORITY

The present application claims priority to a U.S. Provisional Patent Application No. 60/186,322 entitled "Market Depth Display Click Based Trading and Mercury Display" filed Mar. 2, 2000, the contents of which are incorporated herein by reference.

### FIELD OF INVENTION

The present invention is directed to the electronic trading of commodities. Specifically, the invention provides a trader with a versatile and efficient tool for executing trades. It facilitates the display of and the rapid placement of trade orders within the market trading depth of a commodity, where a commodity includes anything that can be traded with quantities and/or prices.

### BACKGROUND OF THE INVENTION

At least 60 exchanges throughout the world utilize electronic trading in varying degrees to trade stocks, bonds, futures, options and other products. These electronic exchanges are based on three components: mainframe computers (host), communications servers, and the exchange participants' computers (client). The host forms the electronic heart of the fully computerized electronic trading system. The system's operations cover order-matching, maintaining order books and positions, price information, and managing and updating the database for the online trading day as well as nightly batch runs. The host is also equipped with external interfaces that maintain uninterrupted online contact to quote vendors and other price information systems.

Traders can link to the host through three types of structures: high speed data lines, high speed communications servers and the Internet. High speed data lines establish direct connections between the client and the host. Another connection can be established by configuring high speed networks or communications servers at strategic access points worldwide in locations where traders physically are located. Data is transmitted in both directions between traders and exchanges via dedicated high speed communication lines. Most exchange participants install two lines between the exchange and the client site or between the communication server and the client site as a safety measure against potential failures. An exchange's internal computer system is also often installed with backups as a redundant measure to secure system availability. The third connection utilizes the Internet. Here, the exchange and the traders communicate back and forth through high speed data lines, which are connected to the Internet. This allows traders to be located anywhere they can establish a connection to the Internet.

Irrespective of the way in which a connection is established, the exchange participants' computers allow traders to participate in the market. They use software that creates specialized interactive trading screens on the traders' desktops. The trading screens enable traders to enter and execute orders, obtain market quotes, and monitor positions. The range and quality of features available to traders on their screens varies according to the specific software application being run. The installation of open interfaces in the development of an exchange's electronic strategy means users can choose, depending on their trading style and internal requirements, the means by which they will access the exchange.

<div style="text-align:center">2</div>

The world's stock, bond, futures and options exchanges have volatile products with prices that move rapidly. To profit in these markets, traders must be able to react quickly. A skilled trader with the quickest software, the fastest communications, and the most sophisticated analytics can significantly improve his own or his firm's bottom line. The slightest speed advantage can generate significant returns in a fast moving market. In today's securities markets, a trader lacking a technologically advanced interface is at a severe competitive disadvantage.

Irrespective of what interface a trader uses to enter orders in the market, each market supplies and requires the same information to and from every trader. The bids and asks in the market make up the market data and everyone logged on to trade can receive this information if the exchange provides it. Similarly, every exchange requires that certain information be included in each order. For example, traders must supply information like the name of the commodity, quantity, restrictions, price and multiple other variables. Without all of this information, the market will not accept the order. This input and output of information is the same for every trader.

With these variables being constant, a competitive speed advantage must come from other aspects of the trading cycle. When analyzing the time it takes to place a trade order for a given commodity, various steps contribute in different amounts to the total time required. Approximately 8% of the total time it takes to enter an order elapses between the moment the host generates the price for the commodity and the moment the order reaches the price. The time it takes for the client application to display the price to the trader amounts to approximately 4%. The time it takes for a trade order to be transmitted to the host amounts to approximately 8%. The remainder of the total time it takes to place an order, approximately 80%, is attributable to the time required for the trader to read the prices displayed and to enter a trade order. The present invention provides a significant advantage during the slowest portion of the trading cycle—while the trader manually enters his order. Traders recognize that the value of time savings in this portion may amount to millions of dollars annually.

In existing systems, multiple elements of an order must be entered prior to an order being sent to market, which is time consuming for the trader. Such elements include the commodity symbol, the desired price, the quantity and whether a buy or a sell order is desired. The more time a trader takes entering an order, the more likely the price on which he wanted to bid or offer will change or not be available in the market. The market is fluid as many traders are sending orders to the market simultaneously. In fact, successful markets strive to have such a high volume of trading that any trader who wishes to enter an order will find a match and have the order filled quickly, if not immediately. In such liquid markets, the prices of the commodities fluctuate rapidly. On a trading screen, this results in rapid changes in the price and quantity fields within the market grid. If a trader intends to enter an order at a particular price, but misses the price because the market prices moved before he could enter the order, he may lose hundreds, thousands, even millions of dollars. The faster a trader can trade, the less likely it will be that he will miss his price and the more likely he will make money.

### SUMMARY OF THE INVENTION

The inventors have developed the present invention which overcomes the drawbacks of the existing trading systems

US 6,772,132 B1

3

and dramatically reduces the time it takes for a trader to place a trade when electronically trading on an exchange. This, in turn, increases the likelihood that the trader will have orders filled at desirable prices and quantities.

The "Mercury" display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently.

Specifically, the present invention is directed to a graphical user interface for displaying the market depth of a commodity traded in a market, including a dynamic display for a plurality of bids and for a plurality of asks in the market for the commodity and a static display of prices corresponding to the plurality of bids and asks. In this embodiment the pluralities of bids and asks are dynamically displayed in alignment with the prices corresponding thereto. Also described herein is a method and system for placing trade orders using such displays.

These embodiments, and others described in greater detail herein, provide the trader with improved efficiency and versatility in placing, and thus executing, trade orders for commodities in an electronic exchange. Other features and advantages of the present invention will become apparent to those skilled in the art from the following detailed description. It should be understood, however, that the detailed description and specific examples, while indicating preferred embodiments of the present invention, are given by way of illustration and not limitation. Many changes and modifications within the scope of the present invention may be made without departing from the spirit thereof, and the invention includes all such modifications.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates the network connections between multiple exchanges and client sites;

FIG. **2** illustrates screen display showing the inside market and the market depth of a given commodity being traded;

FIG. **3** illustrates the Mercury display of the present invention;

FIG. **4** illustrates the Mercury display at a later time showing the movement of values when compared to FIG. **3**;

FIG. **5** illustrates a Mercury display with parameters set in order to exemplify the Mercury trading method; and

FIG. **6** is a flowchart illustrating the process for Mercury display and trading.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As described with reference to the accompanying figures, the present invention provides a display and trading method to ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to place trade orders quickly and efficiently. A commodity's market depth is the current bid and ask prices and quantities in the market. The display and trading method of the invention increase the likelihood that the trader will be able to execute orders at desirable prices and quantities.

In the preferred embodiment, the present invention is implemented on a computer or electronic terminal. The computer is able to communicate either directly or indirectly (using intermediate devices) with the exchange to receive

4

and transmit market, commodity, and trading order information. It is able to interact with the trader and to generate contents and characteristics of a trade order to be sent to the exchange. It is envisioned that the system of the present invention can be implemented on any existing or future terminal or device with the processing capability to perform the functions described herein. The scope of the present invention is not limited by the type of terminal or device used. Further, the specification refers to a single click of a mouse as a means for user input and interaction with the terminal display as an example of a single action of the user. While this describes a preferred mode of interaction, the scope of the present invention is not limited to the use of a mouse as the input device or to the click of a mouse button as the user's single action. Rather, any action by a user within a short period of time, whether comprising one or more clicks of a mouse button or other input device, is considered a single action of the user for the purposes of the present invention.

The system can be configured to allow for trading in a single or in multiple exchanges simultaneously. Connection of the system of the present invention with multiple exchanges is illustrated in FIG. **1**. This figure shows multiple host exchanges **101–103** connected through routers **104–106** to gateways **107–109**. Multiple client terminals **110–116** for use as trading stations can then trade in the multiple exchanges through their connection to the gateways **107–109**. When the system is configured to receive data from multiple exchanges, then the preferred implementation is to translate the data from various exchanges into a simple format. This "translation" function is described below with reference to FIG. **1**. An applications program interface ("TT API" as depicted in the figure) translates the incoming data formats from the different exchanges to a simple preferred data format. This translation function may be disposed anywhere in the network, for example, at the gateway server, at the individual workstations or at both. In addition, the storage at gateway servers and at the client workstations, and/or other external storage cache historical data such as order books which list the client's active orders in the market; that is, those orders that have neither been filled nor cancelled. Information from different exchanges can be displayed at one or in multiple windows at the client workstation. Accordingly, while reference is made through the remainder of the specification to a single exchange to which a trading terminal is connected, the scope of the invention includes the ability to trade, in accordance with the trading methods described herein, in multiple exchanges using a single trading terminal.

The preferred embodiments of the present invention include the display of "Market Depth" and allow traders to view the market depth of a commodity and to execute trades within the market depth with a single click of a computer mouse button. Market Depth represents the order book with the current bid and ask prices and quantities in the market. In other words, Market Depth is each bid and ask that was entered into the market, subject to the limits noted below, in addition to the inside market. For a commodity being traded, the "inside market" is the highest bid price and the lowest ask price.

The exchange sends the price, order and fill information to each trader on the exchange. The present invention processes this information and maps it through simple algorithms and mapping tables to positions in a theoretical grid program or any other comparable mapping technique for mapping data to a screen. The physical mapping of such information to a screen grid can be done by any technique

US 6,772,132 B1

| 5 | 6 |

known to those skilled in the art. The present invention is not limited by the method used to map the data to the screen display.

How far into the market depth the present invention can display depends on how much of the market depth the exchange provides. Some exchanges supply an infinite market depth, while others provide no market depth or only a few orders away from the inside market. The user of the present invention can also chose how far into the market depth to display on his screen.

FIG. **2** illustrates a screen display of an invention described in a commonly owned co-pending application entitled "Click Based Trading with Market Depth Display" Ser. No. 09/589,751, filed on Jun. 9, 2000, the contents of which are incorporated herein by reference. This display shows the inside market and the market depth of a given commodity being traded. Row **1** represents the "inside market" for the commodity being traded which is the best (highest) bid price and quantity and the best (lowest) ask price and quantity. Rows **2–5** represent the "market depth" for the commodity being traded. In the preferred embodiment of the present invention, the display of market depth (rows **2–5**) lists the available next-best bids, in column **203**, and asks, in column **204**. The working bid and ask quantity for each price level is also displayed in columns **202** and **205** respectively (inside market—row **1**). Prices and quantities for the inside market and market depth update dynamically on a real time basis as such information is relayed from the market.

In the screen display shown in FIG. **2**, the commodity (contract) being traded is represented in row **1** by the character string "CDHO". The Depth column **208** will inform the trader of a status by displaying different colors. Yellow indicates that the program application is waiting for data. Red indicates that the Market Depth has failed to receive the data from the server and has "timed out." Green indicates that the data has just been updated. The other column headings in this and all of the other figures, are defined as follows. BidQty (Bid Quantity): the quantity for each working bid, BidPrc (Bid Price): the price for each working bid, AskPrc (Ask Price): the price for each working ask, AskQty (Ask Quantity): the quantity for each working ask, LastPrc (Last Price): the price for the last bid and ask that were matched in the market and LastQty (Last Quantity): the quantity traded at the last price. Total represents the total quantity traded of the given commodity.

The configuration of the screen display itself informs the user in a more convenient and efficient manner than existing systems. Traders gain a significant advantage by seeing the market depth because they can see trends in the orders in the market. The market depth display shows the trader the interest the market has in a given commodity at different price levels. If a large amount of bids or asks are in the market near the trader's position, he may feel he should sell or buy before the inside market reaches the morass of orders. A lack of orders above or below the inside market might prompt a trader to enter orders near the inside market. Without seeing the market depth, no such strategies could be utilized. Having the dynamic market depth, including the bid and ask quantities and prices of a traded commodity aligned with and displayed below the current inside market of the commodity conveys the information to the user in a more intuitive and easily understandable manner. Trends in the trading of the commodity and other relevant characteristics are more easily identifiable by the user through the use of the present invention.

Various abbreviations are used in the screen displays, and specifically, in the column headings of the screen displays

reproduced herein. Some abbreviations have been discussed above. A list of common abbreviations and their meanings is provided in Table 1.

TABLE I

| Abbreviations | |
| --- | --- |
| COLUMN | DESCRIPTION |
| Month | Expiration Month/Year |
| Bid Mbr$_{(1)}$ | Bid Member ID |
| WrkBuys$_{(2)}$ | Working Buys for entire Group ID |
| BidQty | Bid Quantity |
| ThrshBid$_{(6)}$ | Threshold Bid Price |
| BidPrc | Bid Price |
| Bid Qty Accum | Accumulated Bid Quantity |
| BidPrc Avg | Bid Price Average |
| AskPrc Avg | Ask Price Average |
| AskQty Accum | Accumulated Ask Quantity |
| AskPrc | Ask Price |
| ThrshAsk$_{(6)}$ | Threshold Ask Price |
| AskQty | Ask Quantity |
| WrkSells$_{(2)}$ | Working Sells for entire Group ID |
| Ask Mbr$_{(1)}$ | Ask Member ID |
| NetPos | Net Position |
| FFNetPos | Fast Fill Net Position |
| LastPrc | Last Price |
| LastQty | Last Quantity |
| Total | Total Traded Quantity |
| High | High Price |
| Low | Low Price |
| Open | Opening Price |
| Close | Closing Price |
| Chng | Last Price-Last Close |
| TheoPrc | Theoretical Price |
| TheoBid | Theoretical Bid Price |
| TheoAsk | Theoretical Ask Price |
| QAct | Quote Action (Sends individual quotes) |
| BQQ | Test Bid Quote Quantity |
| BQP | Test Bid Quote Price |
| Mkt BQQ | Market Bid Quote Quantity |
| Mkt BQP | Market Bid Quote Price |
| Quote | Checkbox activates/deactivates contract for quoting |
| Mkt AQQ | Market Ask Quote Quantity |
| Mkt AQP | Market Ask Quote Price |
| AQP | Ask Quote Price |
| AQQ | Ask Quote Quantity |
| Imp BidQty$_{(5)}$ | Implied Bid Quantity |
| Imp BidPrc$_{(5)}$ | Implied Bid Price |
| Imp AskQty$_{(5)}$ | Implied Ask Quantity |
| Imp AskPrc$_{(5)}$ | Implied Ask Price |
| Gamma$_{(5)}$ | Change in Delta given 1 pt change in underlying |
| Delta$_{(5)}$ | Change in price given 1 pt change in underlying |
| Vola$_{(34)}$ | Percent volatility |
| Vega$_{(5)}$ | Price change given 1% change in Vola |
| Rho$_{(5)}$ | Price change given 1% change in interest rate |
| Theta$_{(5)}$ | Price change for every day that elapses |
| Click Trd | Activate/deactivate click trading by contract |
| S(Status) | Auction, Closed, FastMkt, Not Tradable, Pre-trading, Tradable, S = post-trading |
| Expiry | Expiration Month/Year |

As described herein, the display and trading method of the present invention provide the user with certain advantages over systems in which a display of market depth, as shown in FIG. **2**, is used. The Mercury display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or

7                                                                                    8

horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently. An example of such a Mercury display is illustrated in the screen display of FIG. 3.

The display of market depth and the manner in which traders trade within the market depth can be effected in different manners, which many traders will find materially better, faster and more accurate. In addition, some traders may find the display of market depth to be difficult to follow. In the display shown in FIG. 2, the market depth is displayed vertically so that both Bid and Ask prices descend the grid. The Bid prices descend the market grid as the prices decrease. Ask prices also descend the market grid as these prices actually increase. This combination may be considered counterintuitive and difficult to follow by some traders.

The Mercury display overcomes this problem in an innovative and logical manner. Mercury also provides an order entry system, market grid, fill window and summary of market orders in one simple window. Such a condensed display materially simplifies the trading system by entering and tracking trades in an extremely efficient manner. Mercury displays market depth in a logical, vertical fashion or horizontally or at some other convenient angle or configuration. A vertical field is shown in the figures and described for convenience, but the field could be horizontal or at an angle. In turn, Mercury further increases the speed of trading and the likelihood of entering orders at desired prices with desired quantities. In the preferred embodiment of the invention, the Mercury display is a static vertical column of prices with the bid and ask quantities displayed in vertical columns to the side of the price column and aligned with the corresponding bid and ask prices. An example of this display is shown in FIG. 3.

Bid quantities are in the column 1003 labeled BidQ and ask quantities are in column 1004 labeled AskQ. The representative ticks from prices for the given commodity are shown in column 1005. The column does not list the whole prices (e.g. 95.89), but rather, just the last two digits (e.g. 89). In the example shown, the inside market, cells 1020, is 18 (best bid quantity) at 89 (best bid price) and 20 (best ask quantity) at 90 (best ask price). In the preferred embodiment of the invention, these three columns are shown in different colors so that the trader can quickly distinguish between them.

The values in the price column are static; that is, they do not normally change positions unless a re-centering command is received (discussed in detail later). The values in the Bid and Ask columns however, are dynamic; that is, they move up and down (in the vertical example) to reflect the market depth for the given commodity. The LTQ column 1006 shows the last traded quantity of the commodity. The relative position of the quantity value with respect to the Price values reflects the price at which that quantity was traded. Column 1001 labeled E/W (entered/working) displays the current status of the trader's orders. The status of each order is displayed in the price row where it was entered. For example, in cells 1007, the number next to S indicates the number of the trader's ordered lots that have been sold at the price in the specific row. The number next to W indicates the number of the trader's ordered lots that are in the market, but have not been filled—i.e. the system is working on filling the order. Blanks in this column indicate that no orders are entered or working at that price. In cells 1008, the number next to B indicates the number of the trader's ordered lots that have been bought at the price in the specific row. The number next to W indicates the number of

the trader's ordered lots that are in the market, but have not been filled—i.e. the system is working on filling the order.

Various parameters are set and information is provided in column 1002. For example, "10:48:44" in cell 1009 shows the actual time of day. The L and R fields in cell 1010 indicate a quantity value, which may be added to the order quantity entered. This process is explained below with respect to trading under Mercury. Below the L and R fields, in cell 1011, a number appears which represents the current market volume. This is the number of lots that have been traded for the chosen contract. Cell 1012, "X 10", displays the Net Quantity, the current position of the trader on the chosen contract. The number "10" represents the trader's buys minus sells. Cell 1013 is the "Current Quantity"; this field represents the quantity for the next order that the trader will send to market. This can be adjusted with right and left clicks (up and down) or by clicking the buttons which appear below the Current Quantity in cells 1014. These buttons increase the current quantity by the indicated amount; for example, "10" will increase it by 10; "1H" will increase it by 100; "1K" will increase it by 1000. Cell 1015 is the Clear button; clicking this button will clear the Current Quantity field. Cell 1016 is the Quantity Description; this is a pull down menu allowing the trader to chose from three Quantity Descriptions. The pull down menu is displayed when the arrow button in the window is clicked. The window includes NetPos, Offset and a field allowing the trader to enter numbers. Placing a number in this field will set a default buy or sell quantity. Choosing "Offset" in this field will enable the L/R buttons of cell 1010. Choosing "NetPos" in this field will set the current Net Quantity (trader's net position) as the trader's quantity for his next trade. Cell 1017 are +/–buttons; these buttons will alter the size of the screen—either larger (+) or smaller (–). Cell 1018 is used to invoke Net 0; clicking this button will reset the Net Quantity (cell 1011) to zero. Cell 1019 is used to invoke Net Real; clicking this button will reset the Net Quantity (cell 1011) to its actual position.

The inside market and market depth ascend and descend as prices in the market increase and decrease. For example, FIG. 4 shows a screen displaying the same market as that of FIG. 3 but at a later interval where the inside market, cells 1101, has risen three ticks. Here, the inside market for the commodity is 43 (best bid quantity) at 92 (best bid price) and 63 (best ask quantity) at 93 (best ask price). In comparing FIGS. 3 and 4, it can be seen that the price column remained static, but the corresponding bids and asks rose up the price column. Market Depth similarly ascends and descends the price column, leaving a vertical history of the market.

As the market ascends or descends the price column, the inside market might go above or below the price column displayed on a trader's screen. Usually a trader will want to be able to see the inside market to assess future trades. The system of the present invention addresses this problem with a one click centering feature. With a single click at any point within the gray area, 1021, below the "Net Real" button, the system will re-center the inside market on the trader's screen. Also, when using a three-button mouse, a click of the middle mouse button, irrespective of the location of the mouse pointer, will re-center the inside market on the trader's screen.

The same information and features can be displayed and enabled in a horizontal fashion. Just as the market ascends and descends the vertical Mercury display shown in FIGS. 3 and 4, the market will move left and right in the horizontal Mercury display. The same data and the same information gleaned from the dynamical display of the data is provided. It is envisioned that other orientations can be used to

| 9 | 10 |

dynamically display the data and such orientations are intended to come within the scope of the present invention.

Next, trading commodities, and specifically, the placement of trade orders using the Mercury display is described. Using the Mercury display and trading method, a trader would first designate the desired commodity and, if applicable, the default quantities. Then he can trade with single clicks of the right or left mouse button. The following equations are used by the system to generate trade orders and to determine the quantity and price to be associated with the trade order. The following abbreviations are used in these formulas: P=Price value of row clicked, R=Value in R field, L=Value in L field, Q=Current Quantity, $Q_a$=Total of all quantities in AskQ column at an equal or better price than P, $Q_b$=Total of all quantities in BidQ column at an equal or better price than P, N=Current Net Position, Bo=Buy order sent to market and So=Sell order sent to market.

Any order entered using right mouse button

$$Bo=(Q_a+R)P \qquad \text{(Eq. 1)}$$

If BidQ field clicked.

$$So=(Q_b+R)P \qquad \text{(Eq. 2)}$$

If AskQ field clicked.

Orders entered using the left mouse button

If "Offset" mode chosen in Quantity Description field then:

$$Bo=(Q_a+L)P \qquad \text{(Eq. 3)}$$

If BidQ field clicked.

$$So=(Q_b+L)P \qquad \text{(Eq. 4)}$$

If AskQ field clicked.

If "number" mode chosen in Quantity Description field then:

$$Bo=QP \qquad \text{(Eq. 5)}$$

$$So=QP \qquad \text{(Eq. 6)}$$

If "NetPos" mode chosen in Quantity Description field then:

$$Bo=NP \qquad \text{(Eq. 7)}$$

$$So=NP \qquad \text{(Eq. 8)}$$

Orders can also be sent to market for quantities that vary according to the quantities available in the market; quantities preset by the trader; and which mouse button the trader clicks. Using this feature, a trader can buy or sell all of the bids or asks in the market at or better than a chosen price with one click. The trader could also add or subtract a preset quantity from the quantities outstanding in the market. If the trader clicks in a trading cell—i.e. in the BidQ or AskQ column, he will enter an order in the market. The parameters of the order depend on which mouse button he clicks and what preset values he set.

Using the screen display and values from FIG. **5**, the placement of trade orders using the Mercury display and trading method is now described using examples. A left click on the 18 in the BidQ column **1201** will send an order to market to sell 17 lots (quantity # chosen on the Quantity Description pull down menu cell **1204**) of the commodity at a price of 89 (the corresponding price in the Prc column

**1203**). Similarly, a left click on the 20 in the AskQ column **1202** will send an order to market to buy 17 lots at a price of 90.

Using the right mouse button, an order would be sent to market at the price that corresponds to the row clicked for the total quantity of orders in the market that equal or better the price in that row plus the quantity in the R field **1205**. Thus, a right click in the AskQ column **1202** in the 87 price row will send a sell order to market at a price of 87 and a quantity of 150. 150 is the sum of all the quantities 30, 97, 18 and 5. 30, 97 and 18 are all of the quantities in the market that would meet or better the trader's sell order price of 87. These quantities are displayed in the BidQ column **1201** because this column represents the orders outstanding in the market to purchase the commodity at each corresponding price. The quantity 5 is the quantity pre-set in the R field **1205**.

Similarly, a right click in the BidQ column **1201** at the same price level of 87 would send a buy limit order to market for a quantity of 5 at a price of 87. The quantity is determined in the same manner as above. In this example, though, there are no orders in the market that equal or better the chosen price—there are no quantities in the AskQ column **1202** that equal or better this price. Therefore, the sum of the equal or better quantities is zero ("0"). The total order entered by the trader will be the value in the R field, which is 5.

An order entered with the left mouse button and the "Offset" option chosen in the quantity description field **1204** will be calculated in the same way as above, but the quantity in the L field **1206** will be added instead of the quantity in the R field **1205**. Thus, a left click in the BidQ column **1201** in the 92 price row will send a buy order to market at a price of 92 and a quantity of 96. 96 is the sum of all the quantities 45, 28, 20 and 3. 45, 28 and 20 are all quantities in the market that would meet or better the trader's buy order price of 92. These quantities are displayed in the AskQ column **1202** because this column represents the orders outstanding in the market to sell the commodity at each corresponding price. The quantity 3 is the quantity pre-set in the L field **1206**.

The values in the L or R fields may be negative numbers. This would effectively decrease the total quantity sent to market. In other words, in the example of a right click in the AskQ column **1202** in the 87 price row, if the R field was −5, the total quantity sent to market would be 140 (30+97+18+ (−5)).

If a trader chose the "NetPos" option in the quantity description field **1204**, a right click would still work as explained above. A left click would enter an order with a price corresponding to the price row clicked and a quantity equal to the current Net position of the trader. The Net position of the trader is the trader's current position on the chosen contract. In other words, if the trader has bought 10 more contracts than he has sold, this value would be 10. NetPos would not affect the quantity of an order sent with a right click.

If the trader chose a number value in the quantity description, a left click would send an order to market for the current quantity chosen by the trader. The default value of the current quantity will be the number entered in the quantity description field, but it could be changed by adjusting the figure in the current quantity field **1204**.

This embodiment of the invention also allows a trader to delete all of his working trades with a single click of either the right or left mouse button anywhere in the last traded quantity (LTQ) column **1207**. This allows a trader to exit the

US 6,772,132 B1

**11**

market immediately. Traders will use this feature when they are losing money and want to stop the losses from pilling up. Traders may also use this feature to quickly exit the market upon making a desired profit. The invention also allows a trader to delete all of his orders from the market at a particular price level. A click with either mouse button in the Entered/Working (E/W) column **1208** will delete all working orders in the cell that was clicked. Thus, if a trader believes that previously sent orders at a particular price that have not been filled would be poor trades, he can delete these orders with a single click.

The process for placing trade orders using the Mercury display and trading method of the present invention as described above is shown in the flowchart of FIG. **6**. First, in step **1301**, the trader has the Mercury display on the trading terminal screen showing the market for a given commodity. In step **1302**, the parameters are set in the appropriate fields, such as the L and R fields and the Current Quantity, NetPos or Offset fields from the pull down menu. In step **1303**, the mouse pointer is positioned and clicked over a cell in the Mercury display by the trader. In step **1304**, the system determines whether the cell clicked is a tradeable cell (i.e. in the AskQ column or BidQ column). If not, then in step **1305**, no trade order is created or sent and, rather, other quantities are adjusted or functions are performed based upon the cell selected. Otherwise, in step **1306**, the system determines whether it was the left or the right button of the mouse that was clicked. If it was the right, then in step **1307**, the system will use the quantity in the R field when it determines the total quantity of the order in step **1310**. If the left button was clicked, then in step **1308**, the system determines which quantity description was chosen: Offset, NetPos or an actual number.

If Offset was chosen, then the system, in step **1309**, will use the quantity in the L field when it determines the total quantity of the order in step **1310**. If NetPos was chosen, then the system, in step **1312**, will determine that the total quantity for the trade order will be current NetPos value, i.e. the net position of the trader in the given commodity. If an actual number was used as the quantity description, then, in step **1311**, the system will determine that the total quantity for the trade order will be the current quantity entered. In step **1310**, the system will determine that the total quantity for the trade order will be the value of the R field (if step **1307** was taken) or the value of the L field (if step **1309** was taken) plus all quantities in the market for prices better than or equal to the price in the row clicked. This will add up the quantities for each order in the market for prices better than the order being entered by the trader (plus the L or R value).

After either steps **1310**, **1311** or **1312**, the system, in step **1313**, determines which column was clicked, BidQ or AskQ. If AskQ was clicked, then, in step **1314**, the system sends a sell limit order to the market at the price corresponding to the row for the total quantity as already determined. If BidQ was clicked, then in step **1315**, the system sends a buy limit order to the market at the price corresponding to the row for the total quantity as already determined.

It should be understood that the above description of the invention and specific examples, while indicating preferred embodiments of the present invention, are given by way of illustration and not limitation. Many changes and modifications within the scope of the present invention may be made without departing from the spirit thereof, and the present invention includes all such changes and modifications.

**12**

We claim:

**1**. A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface and a user input device, said method comprising:

setting a preset parameter for the trade order

displaying market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including at least a portion of the bid and ask quantities of the commodity, the dynamic display being aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;

displaying an order entry region aligned with the static display prices comprising a plurality of areas for receiving commands from the user input devices to send trade orders, each area corresponding to a price of the static display of prices; and

selecting a particular area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

**2**. A method of placing a trade order according to claim **1**, wherein said trade order is a buy order if the position of the pointer at the time of said single action is within a bid order entry region and wherein said trade order is a sell order if the position of the pointer at the time of said single action is within an ask order entry region.

**3**. A method of placing a trade order according to claim **2**, wherein the trade order is for a pre-determined fixed quantity and for a price corresponding to the position of the pointer at the time of said single action.

**4**. A method of placing a trade order according to claim **2**, wherein the trade order is for a quantity equal to a current net position of the user in the commodity and for a price corresponding to the position of the pointer at the time of said single action.

**5**. A method of placing a trade order according to claim **2**, wherein the trade order is for a quantity equal to a pre-determined fixed offset plus the sum of all quantities in the market at prices better than or equal to a price corresponding to the position of the pointer at the time of said single action and for a price corresponding to said position.

**6**. A method of placing a trade order according to claim **2**, wherein said offset is equal to a first pre-determined value if a single action of a first type is taken and said offset is equal to a second pre-determined value if a single action of a second type is taken.

**7**. A method of placing a trade order according to claim **2**, further comprising canceling said trade order in response to a subsequent single action of the user input device.

**8**. A computer readable medium having program code recorded thereon, for execution on a computer having a graphical user interface and a user input device, to place a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, comprising:

a first program code for setting a preset parameter for the trade order;

a second program code displaying market depth of a commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the

US 6,772,132 B1

**13**

commodity, including the bid and ask quantities of the commodity, aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;

a third program code for displaying an order entry region comprising a plurality of areas for receiving commands from the user input device to send trade orders, aligned with the static display of prices, each area corresponding to a price of the static display of prices; and

a fourth program code for receiving a command as a result of a selection of a particular area in the order entry region by a single action of the user input device with a pointer of the user input device positioned over the particular area, to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

**9**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **8**, further comprising program code for establishing that said trade order is a buy order if the position of the pointer at the time of said single action is within a bid order entry region and that said trade order is a sell order if the position of the pointer at the time of said single action is within an ask order entry region.

**10**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **9**, further comprising program code for establishing that the trade order is for a pre-determined fixed quantity and for a price corresponding to the position of the pointer at the time of said single action.

**11**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **9**, further comprising program code for establishing that the trade order is for a quantity equal to a current net position of the user in the commodity and for a price corresponding to the position of the pointer at the time of said single action.

**12**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **9**, further comprising program code for establishing that the trade order is for a quantity equal to a pre-determined fixed offset plus the sum of all quantities in the market at prices better than or equal to a price corresponding to the position of the pointer at the time of said single action and for a price corresponding to said position.

**13**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **12**, further comprising program code for establishing that said offset is equal to a first pre-determined value if a single action of a first type is taken and said offset is equal to a second pre-determined value if a single action of a second type is taken.

**14**. A client system for placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, the system comprising:

a parameter setting component for setting a preset parameter for the trade order;

a display device for displaying market depth of a commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including the bid and ask quantities of the commodity, aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move when the inside market changes,

**14**

and for displaying an order entry region aligned with the static display of prices, comprising a plurality of areas for receiving commands to send trade orders, each area corresponding to a price of the static display of prices;

a user input device for positioning a pointer thereof over an area in the order entry region; and

a trade order sending component for receiving a command as a result of a selection of the area in the order entry region by a single action of the user input device with a pointer of the user input device positioned over the area, to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

**15**. A client system for placing a trade order for a commodity according to claim **14**, wherein said trade order sending component establishes that said trade order is a buy order if the position of the pointer at the time of said single action is within a bid order entry region and that said trade order is a sell order if the position of the pointer at the time of said single action is within an ask order entry region.

**16**. A client system for placing a trade order for a commodity according to claim **15**, wherein said trade order sending component establishes that the trade order is for a pre-determined fixed quantity and for a price corresponding to the position of the pointer at the time of said single action.

**17**. A client system for placing a trade order for a commodity according to claim **15**, wherein said trade order sending component establishes that the trade order is for a quantity equal to a current net position of the user in the commodity and for a price corresponding to the position of the pointer at the time of said single action.

**18**. A client system for placing a trade order for a commodity according to claim **15**, wherein said trade order sending component establishes that the trade order is for a quantity equal to a predetermined fixed offset plus the sum of all quantities in the market at prices better than or equal to a price corresponding to the position of the pointer at the time of said single action and for a price corresponding to said position.

**19**. A client system for placing a trade order for a commodity according to claim **18**, wherein said trade order sending component establishes that said offset is equal to a first pre-determined value if a single action of a first type is taken and said offset is equal to a second predetermined value if a single action of a second type is taken.

**20**. A method according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises displaying said bids and asks in a vertical orientation.

**21**. A method according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises displaying said bids and asks in a horizontal orientation.

**22**. A method according to claim **1**, wherein a plurality of said displayed bids and asks in the market include bid and ask quantities of the commodity.

**23**. A method according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises displaying said bids and asks in different colors.

**24**. A method according to claim **1**, further comprising re-centering said prices corresponding to the bids and asks about an inside market price upon receipt of a re-centering instruction.

**25**. A method according to claim **1**, further comprising dynamically displaying working orders in alignment with the prices corresponding thereto.

US 6,772,132 B1

| 15 | 16 |

**26**. A method of displaying according to claim **1**, further comprising dynamically displaying entered orders in alignment with the prices corresponding thereto, wherein said entered orders indicate a quantity of said commodity for which a trader's orders have been filled at said corresponding prices.

**27**. A method according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises displaying said statically displayed prices in at least one direction in numerical order.

**28**. A method according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises displaying said statically displayed prices along a single line in numerical order.

**29**. A method of displaying according to claim **1**, wherein said displaying the market depth of a commodity traded in a market further comprises dynamically displaying a last traded quantity for said commodity in alignment with the price corresponding thereto.

**30**. A computer readable medium according to claim **8**, further comprising program code to ensure that said displayed bids, asks and prices are oriented vertically.

**31**. A computer readable medium according to claim **8**, further comprising program code to ensure that said displayed bids, asks and prices are oriented horizontally.

**32**. A computer readable medium according to claim **8**, further comprising program code to ensure that a plurality of bids and asks in the market include bid and ask quantities of the commodity.

**33**. A computer readable medium according to claim **8**, further comprising program code to ensure that bids and asks are displayed in different colors.

**34**. A computer readable medium according to claim **8**, further comprising program code to ensure that said displayed prices corresponding to the bids and asks are re-centered about an inside market price upon receipt of a re-centering instruction.

**35**. A computer readable medium according to claim **8**, further comprising program code for dynamically displaying working orders in alignment with the prices corresponding thereto.

**36**. A computer readable medium according to claim **8**, further comprising program code for dynamically displaying entered orders in alignment with the prices corresponding thereto, wherein said entered orders indicate a quantity of said commodity for which a trader's orders have been filled at said corresponding prices.

**37**. A computer readable medium according to claim **8**, further comprising program code to ensure that said statically displayed prices are displayed in at least one direction in numerical order.

**38**. A computer readable medium according to claim **8**, further comprising program code to ensure that said statically displayed prices are displayed along a single line in numerical order.

**39**. A computer readable medium according to claim **8**, further comprising program code for dynamically displaying a last traded quantity for said commodity in alignment with the price corresponding thereto.

**40**. A client system according to claim **14**, wherein said displays are oriented vertically.

**41**. A client system according to claim **14**, wherein said displays are oriented horizontally.

**42**. A client system according to claim **14**, wherein said displays of the pluralities of bids and asks in the market include bid and ask quantities of the commodity.

**43**. A client system according to claim **14**, wherein said displays are displayed in different colors.

**44**. A client system according to claim **14**, wherein said display of prices corresponding to the bids and asks is re-centered about an inside market price upon re-centering instruction from a user.

**45**. A client system according to claim **14**, further comprising a display of working orders displayed in alignment with the prices corresponding thereto.

**46**. A client system according to claim **14**, wherein said display device displays entered orders in alignment with the prices corresponding thereto and wherein said entered orders indicate a quantity of said commodity for which a trader's orders have been filled at said corresponding prices.

**47**. A client system according to claim **14**, wherein said static display of prices is displayed in at least one direction in numerical order.

**48**. A client system according to claim **14**, wherein said static display of prices is displayed along a single line in numerical order.

**49**. A client system according to claim **14**, wherein said display device displays a last traded quantity for said commodity in alignment with the price corresponding thereto.

**50**. The method of claim **2**, wherein the bid order entry region overlaps with a bid display region and the ask order entry region overlaps with an ask display region.

**51**. A computer readable medium having program code recorded thereon, for execution on a computer to place a trade order according to claim **9**, wherein the bid order entry region overlaps with a bid display region and the ask order entry region overlaps with an ask display region.

**52**. A client system for placing a trade order for a commodity according to claim **15**, wherein the bid order entry region overlaps with a bid display region and the ask order entry region overlaps with an ask display region.

**53**. The method of claim **1** wherein the market depth is based on an exchange order book and wherein the static display of prices does not move in response to the addition of a price to the exchange order book, the additional price comprising a displayed price.

**54**. The method of claim **53** wherein the static display of prices does not move in response to the removal of a price from the exchange order book, the removed price comprising a displayed price.

**55**. The method of claim **1** wherein the market depth is based on an exchange order book and the static display of prices never moves in response to a price change in the exchange order book relating to a price which is displayed.

**56**. The method of claim **1** wherein the plurality of additional parameters comprises a price and type of order.

\*    \*    \*    \*    \*



US006766304B2

(12) **United States Patent**

Kemp, II et al.

(10) Patent No.:  **US 6,766,304 B2**

(45) Date of Patent:  **Jul. 20, 2004**

(54) **CLICK BASED TRADING WITH INTUITIVE GRID DISPLAY OF MARKET DEPTH**

(75) Inventors: **Gary Allan Kemp, II**, Winnetka, IL (US); **Jens-Uwe Schluetter**, Evanston, IL (US); **Harris Brumfield**, Chicago, IL (US)

(73) Assignee: **Trading Technologies International, Inc.**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 544 days.

(21) Appl. No.: **09/894,637**

(22) Filed: **Jun. 27, 2001**

(65) **Prior Publication Data**

US 2002/0059129 A1 May 16, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/590,692, filed on Jun. 9, 2000.

(60) Provisional application No. 60/186,322, filed on Mar. 2, 2000.

(51) Int. Cl.[7] ............................................... G06F 17/60
(52) U.S. Cl. ............................. **705/37**; 705/36; 705/35
(58) Field of Search ............................. 705/35, 36, 37; 345/814

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,674,044 A | 6/1987 | Kalmus et al. | 364/408 |
| 4,750,135 A | 6/1988 | Boilen | 364/514 |
| 5,038,284 A | 8/1991 | Kramer | |
| 5,077,665 A | 12/1991 | Silverman et al. | 364/408 |
| 5,136,501 A | 8/1992 | Silverman et al. | 364/408 |
| 5,270,922 A | 12/1993 | Higgins | 364/408 |
| 5,297,031 A | 3/1994 | Gutterman et al. | |
| 5,297,032 A | 3/1994 | Trojan et al. | |
| 5,689,651 A | 11/1997 | Lozman | |

| | | | |
|---|---|---|---|
| 5,774,877 A | 6/1998 | Patterson, Jr. et al. | |
| 5,793,301 A | 8/1998 | Patterson, Jr. et al. | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 98/49639 | 11/1998 |
| WO | WO 99/19821 | 4/1999 |
| WO | WO 99/30259 | 6/1999 |
| WO | WO 99/53424 | 10/1999 |
| WO | WO 00/52619 | 9/2000 |
| WO | WO 00/62187 | 10/2000 |
| WO | WO 00/65510 | 11/2000 |
| WO | WO 01/16830 | 3/2001 |
| WO | WO 01/16852 | 3/2001 |
| WO | WO 01/22315 | 3/2001 |
| WO | WO 01/88808 | 11/2001 |

OTHER PUBLICATIONS

Patsystems News Release, Patsystems Launches J Trader, Nov. 6, 2001.*
www.tradingtechnologies.com/products/xtrade_full.html (viewed May 22, 2001) <Jun. 9, 2000.
Kharouf, A trading room with a view, Fututes, 27, 11—Nov. 1998.
USPTO Presentation, NASDAQ, Nov. 8, 2001, enclosed pp. 1–13.

*Primary Examiner*—Richard Weisberger
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57) **ABSTRACT**

A method and system for reducing the time it takes for a trader to place a trade when electronically trading on an exchange, thus increasing the likelihood that the trader will have orders filled at desirable prices and quantities. The "Mercury" display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently.

**40 Claims, 6 Drawing Sheets**

**US 6,766,304 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,797,002 A | 8/1998 | Patterson, Jr. et al. | |
| 5,845,266 A | 12/1998 | Lupien et al. | |
| 5,915,245 A | 6/1999 | Patterson, Jr. et al. | |
| 5,924,082 A | 7/1999 | Silverman et al. | |
| 5,924,083 A | 7/1999 | Silverman et al. | 705/37 |
| 5,963,923 A | 10/1999 | Garber | 705/37 |
| 6,012,046 A | 1/2000 | Lupien et al. | |
| 6,014,643 A | 1/2000 | Minton | 705/37 |
| 6,098,051 A | 8/2000 | Lupien et al. | |
| 6,131,087 A | 10/2000 | Luke et al. | |
| 6,134,535 A | 10/2000 | Belzberg | |
| 6,195,647 B1 | 2/2001 | Martyn et al. | |
| 6,272,474 B1 | 8/2001 | Garcia | |
| 6,278,982 B1 | 8/2001 | Korhammer et al. | |
| 6,282,521 B1 | 8/2001 | Howorka | |
| 6,408,282 B1 | 6/2002 | Buist | |
| 2002/0023038 A1 | 2/2002 | Fritsch et al. | |
| 2002/0055899 A1 | 5/2002 | Williams | |

* cited by examiner

## FIG. 1

CONNECTION TO MULTIPLE EXCHANGES



# FIG. 2

| | Contract | Depth | BidQty | BidPrc | AskPrc | AskQty | LastPrc | LastQty | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | CDHO | ● | 785 | 7626 | 7627 | 21 | 7627 | 489 | 8230 |
| 2 | | | 626 | 7625 | 7629 | 815 | | | |
| 3 | | | 500 | 7624 | 7630 | 600 | | | |
| 4 | | | 500 | 7623 | 7631 | 2456 | | | |
| 5 | | | 200 | 7622 | 7632 | 800 | | | |

201   202   203   204   205

## FIG. 3

# FIG. 4

| SYCOM FGBL DEC99 | | | | | | □ ▭ ▣ ✕ |
|---|---|---|---|---|---|---|
| E/W | 10:48:44 | | BidQ | AskQ | Prc | LTQ |
| | L | 3 | | 104 | 99 | |
| | R | 5 | | 24 | 98 | |
| | 720 | | | 33 | 97 | |
| | ✕ | 10 | | 115 | 96 | |
| | 0 | | | 32 | 95 | |
| | 10 | 1H | | 27 | 94 | |
| | 50 | 3H | | 63 | 93 | 10 |
| S 10 W 14 | 1K | 5H | | | | |
| | CLR | | 43 | | 92 | |
| | ✕ | 10 | 125 | | 91 | |
| | 17 | ▽ | 97 | | 90 | |
| B 0 W 15 | CXL | | 18 | | 89 | |
| B 0 W 13 | + | - | 97 | | 88 | |
| | NET 0 | | 30 | | 87 | |
| B 0 W 17 | NET REAL | | 43 | | 86 | |
| | | | 110 | | 85 | |
| | | | 23 | | 84 | |
| | | | 31 | | 83 | |
| | | | 125 | | 82 | |
| | | | 21 | | 81 | |

1101

# FIG. 5



FIG. 6

US 6,766,304 B2

| 1 | 2 |

# CLICK BASED TRADING WITH INTUITIVE GRID DISPLAY OF MARKET DEPTH

This application is a divisional application of Ser. No. 09/590,692 filed Jun. 09, 2000 which claims benefit of 60/186,322, filed Mar. 2, 2000.

## PRIORITY

The present application claims priority to a U.S. Provisional Patent Application entitled "Market Depth Display Click Based Trading and Mercury Display" filed Mar. 2, 2000, the contents of which are incorporated herein by reference.

## FIELD OF INVENTION

The present invention is directed to the electronic trading of commodities. Specifically, the invention provides a trader with a versatile and efficient tool for executing trades. It facilitates the display of and the rapid placement of trade orders within the market trading depth of a commodity, where a commodity includes anything that can be traded with quantities and/or prices.

## BACKGROUND OF THE INVENTION

At least 60 exchanges throughout the world utilize electronic trading in varying degrees to trade stocks, bonds, futures, options and other products. These electronic exchanges are based on three components: mainframe computers (host), communications servers, and the exchange participants' computers (client). The host forms the electronic heart of the fully computerized electronic trading system. The system's operations cover order-matching, maintaining order books and positions, price information, and managing and updating the database for the online trading day as well as nightly batch runs. The host is also equipped with external interfaces that maintain uninterrupted online contact to quote vendors and other price information systems.

Traders can link to the host through three types of structures: high speed data lines, high speed communications servers and the Internet. High speed data lines establish direct connections between the client and the host. Another connection can be established by configuring high speed networks or communications servers at strategic access points worldwide in locations where traders physically are located. Data is transmitted in both directions between traders and exchanges via dedicated high speed communication lines. Most exchange participants install two lines between the exchange and the client site or between the communication server and the client site as a safety measure against potential failures. An exchange's internal computer system is Also often installed with backups as a redundant measure to secure system availability. The third connection utilizes the Internet. Here, the exchange and the traders communicate back and forth through high speed data lines, which are connected to the Internet. This allows traders to be located anywhere they can establish a connection to the Internet.

Irrespective of the way in which a connection is established, the exchange participants' computers allow traders to participate in the market. They use software that creates specialized interactive trading screens on the traders' desktops. The trading screens enable traders to enter and execute orders, obtain market quotes, and monitor positions. The range and quality of features available to traders on their screens varies according to the specific software application being run. The installation of open interfaces in the development of an exchange's electronic strategy means users can choose, depending on their trading style and internal requirements, the means by which they will access the exchange.

The world's stock, bond, futures and options exchanges have volatile products with prices that move rapidly. To profit in these markets, traders must be able to react quickly. A skilled trader with the quickest software, the fastest communications, and the most sophisticated analytics can significantly improve his own or his firm's bottom line. The slightest speed advantage can generate significant returns in a fast moving market. In today's securities markets, a trader lacking a technologically advanced interface is at 4 severe competitive disadvantage.

Irrespective of what interface a trader uses to enter orders in the market, each market supplies and requires the same information to and from every trader. The bids and asks in the market make up the market data and everyone logged on to trade can receive this information if the exchange provides it. Similarly, every exchange requires that certain information be included in each order. For example, traders must supply information like the name of the commodity, quantity, restrictions, price and multiple other variables. Without all of this information, the market will not accept the order. This input and output of information the same for every trader.

With these variables being constant, a competitive speed advantage must come from other aspects of the trading cycle. When analyzing the time it takes to place a trade order for a given commodity, various steps contribute in different amounts to the total time required. Approximately 8% of the total time it takes to enter an order elapses between the moment the host generates the price for the commodity and the moment the client receives the price. The time it takes for the client application to display the price to the trader amounts to approximately 4%. The time it takes for a trade order to be transmitted to the host amounts to approximately 8%. The remainder of the total time it takes to place an order, approximately 80%, is attributable to the time required for the trader to read the prices displayed and to enter a trade order. The present invention provides a significant advantage during the slowest portion of the trading cycle—while the trader manually enters his order. Traders recognize that the value of time savings in this portion may amount to millions of dollars annually.

In existing systems, multiple elements of an order must be entered prior to an order being sent to market, which is time consuming for the trader. Such elements include the commodity symbol, the desired price, the quantity and whether a buy or a sell order is desired. The more time a trader takes entering an order, the more likely the price on which he wanted to bid or offer will change or not be available in the market. The market is fluid as many traders are sending orders to the market simultaneously. It fact, successful markets strive to have such a high volume of trading that any trader who wishes to enter an order will find a match and have the order filled quickly, if not immediately. In such liquid markets, the prices of the commodities fluctuate rapidly. On a trading screen, this results in rapid changes in the price and quantity fields within the market grid. If a trader intends to enter an order at a particular price, but misses the price because the market prices moved before he could enter the order, he may lose hundreds, thousands, even millions of dollars. The faster a trader can trade, the less likely it will be that he will miss his price and the more likely he will make money.

US 6,766,304 B2

3
4

## SUMMARY OF THE INVENTION

The inventors have developed the present invention which overcomes the drawbacks of the existing trading systems and dramatically reduces the time it takes for a trader to place a trade when electronically trading on an exchange. This, in turn, increases the likelihood that the trader will have orders filled at desirable prices and quantities.

The "Mercury" display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently.

Specifically, the present invention is directed to a graphical user interface for displaying the market depth of a commodity traded in a market, including a dynamic display for a plurality of bids and for a plurality of asks in the market for the commodity and a static display of prices corresponding to the plurality of bids and asks. In this embodiment the pluralities of bids and asks are dynamically displayed in alignment with the prices corresponding thereto. Also described herein is a method and system for placing trade orders using such displays.

These embodiments, and others described in greater detail herein, provide the trader with improved efficiency and versatility in placing, and thus executing, trade orders for commodities in an electronic exchange. Other features and advantages of the present invention will become apparent to those skilled in the art from the following detailed description. It should be understood, however, that the detailed description and specific examples, while indicating preferred embodiments of the present invention, are given by way of illustration and not limitation. Many changes and modifications within the scope of the present invention may be made without departing from the spirit thereof, and the invention includes all such modifications.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates the network connections between multiple exchanges and client sites;

FIG. 2 illustrates screen display showing the inside market and the market depth of a given commodity being traded;

FIG. 3 illustrates the Mercury display of the present invention;

FIG. 4 illustrates the Mercury display at a later time showing the movement of values when compared to FIG. 3;

FIG. 5 illustrates a Mercury display with parameters set in order to exemplify the Mercury trading method; and

FIG. 6 is a flowchart illustrating the process for Mercury display and trading.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As described with reference to the accompanying figures, the present invention provides a display and trading method to ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to place trade orders quickly and efficiently. A commodity's market depth is the current bid and ask prices and quantities in the market. The display and trading method of the invention increase the likelihood that the trader will be able to execute orders at desirable prices and quantities.

In the preferred embodiment, the present invention is implemented on a computer or electronic terminal. The computer is able to communicate either directly or indirectly (using intermediate devices) with the exchange to receive and transmit market, commodity, and trading order information. It is able to interact with the trader and to generate contents and characteristics of a trade order to be sent to the exchange. It is envisioned that the system of the present invention can be implemented on any existing or future terminal or device with the processing capability to perform the functions described herein. The scope of the present invention is not limited by the type of terminal or device used. Further, the specification refers to a single click of a mouse as a means for user input and interaction with the terminal display as an example of a single action of the user. While this describes a preferred mode of interaction, the scope of the present invention is not limited to the use of a mouse as the input device or to the click of a mouse button as the user's single action. Rather, any action by a user within a short period of time, whether comprising one or more clicks of a mouse button or other input device, is considered a single action of the user for the purposes of the present invention.

The system can be configured to allow for trading in a single or in multiple exchanges simultaneously. Connection of the system of the present invention with multiple exchanges is illustrated in FIG. 1. This figure shows multiple host exchanges 101–103 connected through routers 104–106 to gateways 107–109. Multiple client terminals 110–116 for use as trading stations can then trade in the multiple exchanges 107–109 through their connection to the gateways 107–109. When the system is configured to receive data from multiple exchanges, then the preferred implementation is to translate the data from various exchanges into a simple format. This. "translation" function is described below with reference to FIG. 1. An applications program interface ("TT API" as depicted in the figure) translates the incoming data formats from the different exchanges to a simple preferred data format. This translation function may be disposed anywhere in the network, for example, at the gateway server, at the individual workstations or at both. In addition, the storage at gateway servers and at the client workstations, and/or other external storage cache historical data such as order books which list the client's active orders in the market; that is, those orders that have neither been filled nor cancelled. Information from different exchanges can be displayed at one or in multiple windows at the client workstation. Accordingly, 'while reference is made through the remainder of the specification to a single exchange to which a trading terminal is connected, the scope of the invention includes the ability to trade, in accordance with the trading methods described herein, in multiple exchanges using a single trading terminal.

The preferred embodiments of the present invention include the display of "Market Depth" and allow trader to view the market depth of a commodity and to execute trades within the market depth with a single click of a computer mouse button. Market Depth represents the order book with the current bid and ask prices and quantities in the market. In other words, Market Depth is each bid and ask that was entered into the market, subject to the limits noted below, in addition to the inside market. For a commodity being traded, the "inside market" is the highest bid price and the lowest ask price.

The exchange sends the price, order and fill information to each trader on the exchange. The present invention processes this information and maps it through simple

US 6,766,304 B2

5

algorithms and mapping tables to positions in a theoretical grid program or any other comparable mapping technique for mapping data to a screen. The physical mapping of such information to a screen grid can be done by any technique known to those skilled in the art. The present invention is not limited by the method used to map the data to the screen display.

How far into the market depth the present invention can display depends on how much of the market depth the exchange provides. Some exchanges supply an infinite market depth, while others provide no market depth or only a few orders away from the inside market. The user of the present invention can also chose how far into the market depth to display on his screen. FIG. **2** illustrates a screen display of an invention described in a commonly owned co-pending application entitled "Click Based Trading with Market Depth Display" Ser. No. 09/589,751, filed on Jun. 9, 2000, the contents of which are incorporated herein by reference. This display shows the inside market and the market depth of a given commodity being traded. Row **1** represents the "inside market" for the commodity being traded which is the best (highest) bid price and quantity and the best (lowest) ask price and quantity. Rows **2–5** represent the "market depth" for the commodity being traded. In the preferred embodiment of the present invention, the display of market depth (rows **2–5**) lists the available next-best bids, in column **203**, and asks, in column **204**. The working bid and ask quantity for each price level is also displayed in columns **202** and **205** respectively (inside market–row **1**). Prices and quantities for the inside market and market depth update dynamically on a real time basis as such information is relayed from the market.

In the screen display shown in FIG. **2**, the commodity (contract) being traded is represented in row **1** by the character string "CDHO". The Depth column **208** will inform the trader of a status by displaying different colors. Yellow indicates that the program application is waiting for data. Red indicates that the Market Depth has failed to

6

receive the data from the server and has "timed out." Green indicates that the data has just been updated. The other column headings in this and all of the other figures, are defined as follows. BidQty (Bid Quantity): the quantity for each working bid, BidPrc (Bid Price): the price for each working bid, AskPrc (Ask Price): the price for each working ask, AskQty (Ask Quantity): the quantity for each working ask, LastPrc (Last Price): the price for the last bid and ask that were matched in the market and LastQty (Last Quantity): the quantity added at the last price. Total represents the total quantity traded of the given commodity.

The configuration of the screen display itself informs the user in a more convenient and efficient manner than existing systems. Traders gain a significant advantage by seeing the market depth because they can see trends in the orders in the market. The market depth display shows the trader the interest the market has in a given commodity at different price levels. If a large amount of bids or asks are in the market near the trader's position, he may feel he should sell or buy before the inside market reaches the morass of orders. A lack of orders above or below the inside market might prompt a trader to enter orders near the inside market. Without seeing the market depth, no such strategies could be utilized. Having the dynamic market depth, including the bid and ask quantities and prices of a traded commodity aligned with and displayed below the current inside market of the commodity conveys the information to the user in a more intuitive and easily understandable manner. Trends in the trading of, the commodity and other relevant characteristics are more easily identifiable by the user through the use of the present invention.

Various abbreviations are used in the screen displays, and specifically, in the column headings of the screen displays reproduced herein. Some abbreviations have been discussed above. A list of common abbreviations and their meanings is provided in Table 1.

TABLE I

Abbreviations.

| COLUMN | DESCRIPTION | COLUMN | DESCRIPTION |
|---|---|---|---|
| Month | Expiration Month/Year | TheoBid | Theoretical Bid Price |
| Bid Mbr(1) | Bid Member ID | TheoAsk | Theoretical Ask Price |
| WrkBuys(2) | Working Buys for entire Group ID | Qact | Quote Action (Sends individual quotes) |
| BidQty | Bid Quantity | BQQ | Test Bid Quote Quantity |
| ThrshBid(6) | Threshold Bid Price | BQP | Test Bid Quote Price |
| BidPrc | Bid Price | Mkt BQQ | Market Bid Quote Quantity |
| Bid Qty Accrun | Accumulated Bid Quantity | Mkt BQP | Market Bid Quote Price |
| BidPrc Avg | Bid Price Average | Quote | Checkbox activates/ deactivates contract for quoting |
| AskPrc Avg | Ask Price Average | Mkt AQQ | Market Ask Quote Quantity |
| AskQty Accrun | Accumulated Ask Quantity | Mkt AQP | Market Ask Quote Price |
| AskPrc | Ask Price | AQP | Ask Quote Price |
| ThrshAsk(6) | Threshold Ask Price | AQQ | Ask Quote Quantity |
| AskQty | Ask Quantity | Imp BidQty(5) | Implied Bid Quantity |
| WrkSells(2) | Working Sells for entire Group ID | Imp BidPrc(5) | Implied Bid Price |
| Ask Mbr(1) | Ask Member ID | Imp AskQty(5) | Implied Ask Quantity |
| NetPos | Net Position | Imp AskPrc(5) | Implied Ask Price |
| FFNetPos | Fast Fill Net Position | Gamma(3) | Change in Delta given 1 pt change in underlying |
| LastPrc | Last Price | Delta (3) | Change in price given 1 pt change in underlying |
| LastQty | Last Quantity | Vola (3) | Percent volatility |
| Total | Total Traded Quantity | Vega (3) | Price change given 1% change in Vola |
| High | High Price | Rhop (3) | Price change given 1% change in interest rate |

US 6,766,304 B2

7                                                                    8

TABLE I-continued

Abbreviations.

| COLUMN | DESCRIPTION | COLUMN | DESCRIPTION |
|--------|-------------|--------|-------------|
| Low | Low Price | Theta(3) | Price change for every day that elapses |
| Open | Opening Price | Click Trd | Activate/deactivate click trading by contract |
| Close | Closing Price | S (Status) | Auction, Closed, FastMkt, Not Tradable, Pre-trading, Tradable, S = post-trading |
| Chng | Last Price-Last Close | Expiry | Expiration Month/Year |
| TheoPrc | Theoretical Price | | |

As described herein, the display and trading method of the present invention provide the user with certain advantages over systems in which a display of market depth, as shown in FIG. **2**, is used. The Mercury display and trading method of the present invention ensure fast and accurate execution of trades by displaying market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market prices fluctuates. This allows the trader to trade quickly and efficiently. An example of such a Mercury display is illustrated in the screen display of FIG. **3**.

The display of market depth and the manner in which traders trade within the market depth can be effected in different manners, which many traders will find materially better, faster and more accurate. In addition, some traders may find the display of market depth to be difficult to follow. In the display shown in FIG. **2**, the market depth is displayed vertically so that both Bid and Ask prices descend the grid. The Bid prices descend the market grid as the prices decrease. Ask prices also descend the market grid as these prices actually increase. This combination may be considered counterintuitive and difficult to follow by some traders.

The Mercury display overcomes this problem in an innovative and logical manner. Mercury also provides an order entry system, market grid, fill window and summary of market orders in one simple window. Such a condensed display materially simplifies the trading system by entering and tracking trades in an extremely efficient manner. Mercury displays market depth in a logical, vertical fashion or horizontally or at some other convenient angle or configuration. A vertical field is shown in the figures and described for convenience, but the field could be horizontal or at an angle. In turn, Mercury further increases the speed of trading and the likelihood of entering orders at desired prices with desired quantities. In the preferred embodiment of the invention, the Mercury display is a static vertical column of prices with the bid and ask quantities displayed in vertical columns to the side of the price column and aligned with the corresponding bid and ask prices. An example of this display is shown in FIG. **3**.

Bid quantities are in the column **1003** labeled BidQ and ask quantities are in column **1004** labeled AskQ. The representative ticks from prices for the given commodity are shown in column **1005**. The column, does not list the whole prices (e.g. 95.89), but rather, just the last two digits (e.g. 89). In the example shown, the inside market, cells **1020**, is 18 (best bid quantity) at 89 (best bid price) and 20 (best ask quantity) at 90 (best ask price). In the preferred embodiment of the invention, these three columns are shown in different colors so that the trader can quickly distinguish between them.

The values in the price column are static; that is, they do not normally change positions unless a re-centering command is received (discussed in detail later). The values in the

Bid and Ask columns however, are dynamic; that is, they move up and down (in the vertical example) to reflect the market depth for the given commodity. The LTQ column **1006** shows the last traded quantity of the commodity. The relative position of the quantity value with respect to the Price values reflects the price at which that quantity was traded. Column **1001** labeled E/W (entered/working) displays the current status of the trader's orders. The status of each order is displayed in the price row where it was entered. For example, in cells **1007**, the number next to S indicates the number of the trader's ordered lots that have been sold at the price in the specific row. The number next to W indicates the number of the trader's ordered lots that are in the market, but have not been filled–i.e. the system is working on filling the order. Blanks in this column indicate that no orders are entered or working at that price. In cells **1008**, the number next to B indicates the number of the trader's ordered lots that have been bought at the price in the specific row. The number next to W indicates the number of the trader's ordered lots that are in the market, but have not been filled–i.e. the system is working on filling the order.

Various parameters are set and information is provided in column **1002**. For example, "10:48:44" in cell **1009** shows the actual time of day. The L and R fields in cell **1010** indicate a quantity value, which may be added to the order quantity entered. This process is explained below with respect to trading under Mercury. Below the L and R fields, in cell **1011**, a number appears which represents the current market volume. This is the number of lots that have been traded for the chosen contract. Cell **1012**, "X 10", displays the Net Quantity, the current position of the trader on the chosen contract. The number "10" represents the trader's buys minus sells. Cell **1013** is the "Current Quantity"; this field represents the quantity for the next order that the trader will send to market. This can be adjusted with right and left clicks (up and down) or by clicking the buttons which appear below the Current Quantity in cells **1014**. These buttons increase the current quantity by the indicated amount; for example, "10" will increase it by 10; "1H" will increase it by 100; "1K" will increase it by 1000. Cell **1015** is the Clear button; clicking this button will clear the Current Quantity field. Cell **1016** is the Quantity Description; this is a pull down menu allowing the trader to chose from three Quantity Descriptions. The pull down menu is displayed when the arrow button in the window is clicked. The window includes NetPos, Offset and a field allowing the trader to enter numbers.. Placing a number in this field will set a default buy or sell quantity. Choosing "Offset" in this field will enable the L/R buttons of cell **1010**. Choosing "NetPos" in this field will set the current Net Quantity (trader's net position) as the trader's quantity for his next trade. Cell **1017** are +/− buttons; these buttons will alter the size of the screen–either larger (+) or smaller (−). Cell **1018** is used to invoke Net **0**; clicking this button will reset the Net Quantity

US 6,766,304 B2

9                                                                              10

(cell **1011**) to zero. Cell **1019** is used to invoke Net Real; clicking this button will reset the Net Quantity (cell **10 11**) to its actual position.

The inside market and market depth ascend and descend as prices in the market increase and decrease. For example, FIG. **4** shows a screen displaying the same market as that of FIG. **3** but at a later interval where the inside market, cells **1101**, has risen three ticks. Here, the inside market for the commodity is 43 (best bid quantity) at 92 (best bid price) and 63 (best ask quantity) at 93 (best ask price). In comparing FIGS. **3** and **4**, it can be seen that the price column remained static, but the corresponding bids and asks rose up the price column. Market Depth similarly ascends, and descends the price column, leaving a vertical history of the market.

As the market ascends or descends the price column, the inside market, might go above or below the price column displayed on a trader's screen. Usually a trader will want to be able to see the inside market to assess future trades. The system of the present invention addresses this problem with a one click centering feature. With a single click at any point within the gray area, **1021**, below the "Net Real" button, the system will re-center the inside market on the trader's screen. Also, when using a three-button mouse, a click of the middle mouse button, irrespective of the location of the mouse pointer, will re-center the inside market on the trader's screen.

The same information and features can be displayed and enabled in a horizontal fashion. Just as -the market ascends and descends the vertical Mercury display shown in FIGS. **3** and **4**, the market will move left and right in the horizontal Mercury display. The same data and the same information gleaned from the dynamical display of the data is provided. It is envisioned that other orientations can be used to dynamically display the data and such orientations are intended to come within the scope of the present invention.

Next, trading commodities, and specifically, the placement of trade orders using the Mercury display is described. Using the Mercury display and trading method, a trader would first designate the desired commodity and, if applicable, the default quantities. Then he can trade with single clicks of the right or left mouse button. The following equations are used by the system to generate trade orders and to determine the quantity and price to be associated with the trade order. The following abbreviations are used in these formulas: P=Price value of row clicked, R=Value in R field, L=Value in L field, Q=Current Quantity, $Q_a$=Total of all quantities in AskQ column at an equal or better price than P, $Q_b$=Total of all quantities in BidQ column at an equal or better price than P, N=Current Net Position, Bo=Buy order sent to market and So=Sell order—sent to market.

Apy order entered using right mouse button

$$Bo=(Q_a+R)P \qquad (Eq. 1)$$

If BidQ field clicked.

$$So=(Q_b+R)P \qquad (Eq. 2)$$

If AskQ field clicked.

Orders entered using the left mouse button

If "Offset" mode chosen in Quantity Description field then:

$$Bo=(Q_a+L)P \qquad (Eq. 3)$$

If BidQ field clicked.

$$SO=(Q_b+L)P \qquad (Eq. 4)$$

If AskQ field clicked.

If "number" mode chosen in Quantity Description field then:

$$Bo=QP \qquad (Eq. 5)$$

$$So=QP \qquad (Eq. 6)$$

If "NetPos" mode chosen in Quantity Description field then:

$$Bo=NP \qquad (Eq. 7)$$

$$So=NP \qquad (Eq. 8)$$

Orders can also be sent to market for quantities that vary according to the quantities available in the market; quantities preset by the trader; and which mouse button the trader clicks. Using this feature, a trader can buy or sell all of the bids or asks in the market at or better than a chosen price with one click. The trader could also add or subtract a preset quantity from the quantities outstanding in the market. If the trader clicks in a trading cell—i.e. in the BidQ or AskQ column, he will enter an order in the market. The parameters of the order depend on which mouse button he clicks and what preset values he set.

Using the screen display and values from FIG. **5**, the placement of trade orders using the Mercury display and trading method is now described using examples. A left click on the 18 in the BidQ column **1201** will send an order to market to buy **17** lots (quantity #chosen in the Quantity Description pull down menu cell **1204**) of the commodity at a price of 89 (the corresponding price in the Prc column **1203**). Similarly, a left click on the 20 in the AskQ column **1202** will send an order to market to sell **17** lots at a price of 90.

Using the right mouse button, an order would be sent to market at the price that corresponds to the row clicked for the total quantity of orders in the market that equal or better the price in that row plus the quantity in the R field **1205**. Thus, a right click in the AskQ column **1202** in the 87 price row will send a sell order to market at a price of 87 and a quantity of 150. 150 is the sum of all the quantities 30, 97, 18 and 5. 30, 97 and 18 are all of the quantities in the market that would meet or better the trader's sell order price of 87. These quantities are displayed in the BidQ column **1201** because this column represents the orders outstanding in the market to purchase the commodity at each corresponding price. The quantity 5 is the quantity pre-set in the R field **1205**.

Similarly, a right click in the BidQ column **1201** at the same price level of 87 would send a buy limit order to market for a quantity of 5 at a price of 87. The quantity is determined in the game manner as above. In this example, though, there are no orders in the market that equal or better the chosen price—there are no quantities in the AskQ column **1202** that equal or better this price. Therefore, the sum of the equal or better quantities is zero ("0"). The total order entered by the trader will be the value in the R field, which is 5.

An order entered with the left mouse button and the "Offset" option chosen in the quantity description field **1204**

US 6,766,304 B2

11 | 12

will be calculated in the same way as above, but the quantity in the L field **1206** will be added instead of the quantity in the R field **1205**. Thus, a left click in the BidQ column **1201** in the 92 price row will send a buy order to market at a price of 92 and a quantity of 96. 96 is the sum of all the quantities 45, 28, 20 and 3. 45, 28 and 20 are all quantities in the market that would meet or better the trader's buy order price of 92. These quantities are displayed in the AskQ column **1202** because this column represents the orders outstanding in the market to sell the commodity at each corresponding price. The quantity 3 is the quantity pre-set in the L field **1206**.

The values in the L or R fields may be negative numbers. This would effectively decrease the total quantity sent to market. In other words, in the example of a right click in the AskQ column **1202** in the 87 price row, if the R field was −5, the total quantity sent to market would be 140 (30+97+18+(−5)).

If a trader chose the "NetPos" option in the quantity description field **1204**, a right click would still work as explained above. A left click would enter an order with a price corresponding to the price row clicked and a quantity equal to the current Net position of the trader. The Net position of the trader is the trader's current position on the chosen contract. In other words, if the trader has bought 10 more contracts than he has sold, this value would be 10. NetPos would not affect the quantity of an order sent with a right click.

If the trader chose a number value in the quantity description, a left click would send an order to market for the current quantity chosen by the trader. The default value of the current quantity will be the number entered in the quantity description field, but it could be changed by adjusting the figure in the current quantity field **1204**.

This embodiment of the invention also allows a trader to delete all of his working trades with a single click of either the right or left mouse button anywhere in the last traded quantity (LTQ) column **1207**. This allows a trader to exit the market immediately. Traders will use this feature when they are losing money and want to stop the losses from pilling up. Traders may also use this feature to quickly exit the market upon making a desired profit. The invention also allows a trader to delete all of his orders from the market at a particular price level. A click with either mouse button in the Entered/Working (E/W) column **1208** will delete all working orders in the cell that was clicked. Thus, if a trader believes that previously sent orders at a particular price that have not been filled would be poor trades, he can delete these orders with a single click.

The process for placing trade orders using the Mercury display and trading method of the present invention as described above is shown in the flowchart of FIG. **6**. First, in step **1301**, the trader has the Mercury display on the trading terminal screen showing the market for a given commodity. In step **1302**, the parameters are set in the appropriate fields, such as the L and R fields and the Current Quantity, NetPos or Offset fields from the pull down menu. In step **1303**, the mouse pointer is positioned and clicked over a cell in the Mercury display by the trader. In step **1304**, the system determines whether the cell clicked is a tradable cell (i.e. in the AskQ column or BidQ column). If not, then in step **1305**, no trade order is created or sent and, rather, other quantities are adjusted or functions are performed based upon the cell selected. Otherwise, in step **1306**, the system determines whether it was the left or the right button of the mouse that was clicked. If it was the right, then in step **1307**, the system will use the quantity in the R field when it

determines the total quantity of the order in step **1310**. If the left button was clicked, then in step **1308**, the system determines which quantity description was chosen: Offset, NetPos or an actual number.

If Offset was chosen, then the system, in step **1309**, will use the quantity in the L field when it determines the total quantity of the. order in step **1310**. If NetPos was chosen, then the system, in step **1312**, will determine that the total quantity for the trade order will be current NetPos value, i.e. the net position of the trader in the given commodity. If an actual number was used as the quantity description, then, in step **1311**, the system will determine that the total quantity for the trade order will be the current quantity entered. In step **1310**, the system will determine that the total quantity for the trade order will be the value of the R field (if step **1307** was taken) or the value of the L field (if step **1309** was taken) plus all quantities in the market for prices better than or equal to the price in the row clicked. This will add up the quantities for each order in, the market that will fill the order being entered by the trader (plus the L or R value).

After either steps **1310**, **1311** or **1312**, the system, in step **1313**, determines which column was clicked, BidQ or AskQ. If AskQ was clicked, then, in step **1314**, the system sends a sell limit order to the market at the price corresponding to the row for the total quantity as already determined. If BidQ was clicked, then, in-step **1315**, the system sends a buy limit order to the market at the price corresponding to the row for the total quantity as already determined.

It should be understood that the above description of the invention and specific examples, while indicating preferred embodiments of the present invention, are given by way of illustration and not limitation. Many changes and modifications within the scope of the present invention may be made without departing from the spirit thereof, and the present invention includes all such changes and modifications.

We claim:

1. A method for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the method comprising:

dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;

dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the common static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;

displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis;

displaying an order entry region comprising a plurality of locations for receiving commands to send trade orders, each location corresponding to a price level along the common static price axis; and

in response to a selection of a particular location of the order entry region by a single action of a user input

US 6,766,304 B2

13

device, setting a plurality of parameters for a trade order relating to the commodity and sending the trade order to the electronic exchange.

**2**. The method of claim **1** wherein the bid and ask display regions and the order entry region comprise columns with a plurality of cells that are displayed as a grid such that the cells of each column are aligned.

**3**. The method of claim **1** wherein the bid and ask display regions and the order entry region are oriented vertically.

**4**. The method of claim **1** wherein the bid and ask display regions and the order entry region are oriented horizontally.

**5**. The method of claim **1** wherein one of the plurality of locations of bid display region comprises a blank region in which there is no first indicator displayed.

**6**. The method of claim **1** wherein one of the plurality of locations of the ask display region comprises a blank region in which there is no first indicator displayed.

**7**. The method of claim **1** comprising the step of displaying at least a portion of the common static price axis in a price display region.

**8**. The method of claim **7** wherein the bid display region, the ask display region, the order entry region and the price display region comprise columns with a plurality of cells that are displayed as a grid such that the cells of each column are aligned.

**9**. The method of claim **7** wherein the bid display region, the ask display region, the order entry region and the price display region are oriented vertically.

**10**. The method of claim **7** wherein the bid display region, the ask display region, the order entry region and the price display region are oriented horizontally.

**11**. The method of claim **1** further comprising the steps of:

dynamically displaying a third indicator at one of the plurality of locations in the bid display region, the third indicator representing quantity associated with at least one order to buy the commodity at a price different than the highest bid price currently available in the market; and

dynamically displaying a fourth indicator at one of the plurality of locations in the ask display region, the fourth indicator representing quantity associated with at least one order to sell the commodity at a price different than the lowest ask price currently available in the market.

**12**. The method of claim **11** wherein a location of the plurality of locations of the bid display region comprises a blank region in which there is no first or third indicator displayed.

**13**. The method of claim **1** wherein a location of the plurality of locations of the ask display region comprises a blank region in which there is no second or fourth indicator displayed.

**14**. The method of claim **1** wherein the order entry region comprises:

a bid order entry region comprising a plurality of locations for receiving commands to send buy orders, each location corresponding to a price level along the common static price axis; and

an ask order entry region comprising a plurality of locations for receiving commands to send sell orders, each location corresponding to a price level along the common static price axis.

**15**. The method of claim **14** wherein the bid order entry region overlaps with the bid display region and the ask order entry region overlaps with the ask display region.

**16**. The method of claim **1** further comprising dynamically displaying an entered order indicator in association with the price levels arranged along the common static price axis.

14

**17**. The method of claim **16** wherein the entered order indicator is displayed in an entered order region.

**18**. The method of claim **1** further comprising dynamically displaying a last trade indicator in association with the common static price axis.

**19**. The method of claim **18** wherein the last trade indicator is displayed in a last trade region.

**20**. The method of claim **1** further comprising the steps of:

displaying the first indicator at a first location associated with a first price level on the common static price axis at a first time; and

displaying the first indicator at a second location associated with a different price level on the common static price axis at a second time subsequent to the first time.

**21**. The method of claim **1** further comprising the steps of:

displaying the second indicator at a first location associated with a first price level on the common static price axis at a first time; and

displaying the second indicator at a second location associated with a different price level on the common static price axis at a second time subsequent to the first time.

**22**. The method of claim **1** further comprising the steps of:

displaying the first indicator at a first location associated with a particular price level on the common static price axis; and

repositioning the common static price axis such that the first indicator is displayed at a second location associated with the particular price level on the common static price axis.

**23**. The method of claim **1** further comprising the steps of:

displaying the second indicator at a first location associated with a particular price level on the common static price axis; and

repositioning the common static price axis such that the second indicator is displayed at a second location associated with the particular price level on the common static price axis.

**24**. The method of claim **1** wherein the bid and ask display regions are displayed in different colors.

**25**. The method of claim **1** wherein the first and second indicators are displayed in different colors.

**26**. The method of claim **1** wherein the bid and ask display regions are displayed in a window further comprising centering the display of the first and second indicators in the window upon receipt of a centering instruction.

**27**. A computer readable medium having program code recorded thereon for execution on a computer for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the program code causing a machine to perform the following method steps:

dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;

dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a the price level along the common Static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;

US 6,766,304 B2

15

displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis;

displaying an order entry region comprising a plurality of locations for receiving commands to send trade orders, each location corresponding to a price level along the common static price axis; and

in response to a selection of a particular location of the order entry region by a single action of a user input device, setting a plurality of parameters for a trade order relating to the commodity and sending the trade order to the electronic exchange.

**28**. The method of claim **11** wherein the first and third indicators are displayed in locations of the bid display region that are arranged along an axis which is parallel to the common static price axis.

**29**. The method of claim **11** wherein the second and fourth indicators are displayed in locations of the ask display region that are arranged along an axis which is parallel to the common static price axis.

**30**. The method of claim **11** comprising the steps of:

displaying the first indicator at a first location associated with a first price level on the common static price axis at a first time; and

displaying the first indicator at a second location associated with a different price level on the common static price axis at a second time subsequent to the first time.

**31**. The method of claim **30** wherein the third and fourth indicators remain in the same location in the bid and ask display regions, respectively, before and after the first indicator is displayed at the second location.

**32**. The method of claim **31** wherein each location of the bid display region corresponds to a different price level along the common static price axis and each location of the ask display region corresponds to a different price level along the common static price.

16

**33**. The method of claim **11** comprising the steps of:

displaying the second indicator at a first location associated with a first price level on the common static price axis at a first time; and

displaying the second indicator at a second location associated with a different price level on the common static price axis at a second time subsequent to the first time.

**34**. The method of claim **33** wherein the third and fourth indicators remain in the same location in the bid an ask display regions, respectively, before and after the second indicator is displayed at the second location.

**35**. The method of claim **34** wherein each location of the bid display region corresponds to a different price level along the common static price axis and each location of the ask display region corresponds to a different price level along the common static price.

**36**. The method of claim **1** wherein the bid and ask display regions are displayed separately.

**37**. The method of claim **1** wherein the first and second indicators are based on an exchange order book and wherein the price levels along the common static price axis do not move in response to the addition of a price to the exchange order book, the additional price comprising a price for which there is a corresponding displayed location in at least one of the bid and ask display regions.

**38**. The method of claim **37** wherein the price levels along the common static price axis do not move in response to the removal of a price from the exchange order book, the removed price comprising a price for which there is a corresponding displayed location in at least one of the bid and ask display regions.

**39**. The method of claim **1** wherein the first and second indicators are based on an exchange order book and the price levels along the common static price axis never move in response to a price change in the exchange order book relating to a price which corresponds to a displayed location in at least one of the bid and ask display regions.

**40**. The method of claim **1** the plurality of parameters comprises a price and type of order.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,766,304 B2                                    Page 1 of 1
DATED          : July 20, 2004
INVENTOR(S)    : Gary Allan Kemp II, Jens-Uwe Schluetter and Harris Brumfield

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [56], **References Cited**, U.S. PATENT DOCUMENTS, add the following:
-- 4,903,201     A     2/1990          Wagner
   5,101,353     A     3/1992          Lupien et al.
   5,946,667     A     8/1999          Tull, Jr., et al.
   6,035,287     A     3/2000          Stallaert et al.
   2002/0138401 A1    9/2002          Allen et al. --
FOREIGN PATENT DOCUMENTS, add the following:
-- WO          WO 95/35005           9/1995 --

Column 14,
Line 64, the word "Static" should be -- static --.

Column 15,
Line 26, after "claim 11" add the word -- further --.

Column 16,
Line 1, after "claim 11" add the word -- further --.
Line 10, the word "an" should be -- and --.
Line 40, after "claim 1" add -- wherein --.

Signed and Sealed this

Sixteenth Day of November, 2004

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2016, I caused this Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record.

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellants will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.


Dated:  April 25, 2016                    /s/  *Kenneth R. Adamo*

                                          Kenneth R. Adamo

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32.  According to the word processing system used to prepare it, the brief contains 13,332 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.


/s/ *Kenneth R. Adamo*
Kenneth R. Adamo